**Luis G. MORALES, Plaintiff,**

v.

**DAIN, KALMAN & QUAIL, INC., Defendant.**

Civ. No. 4–76–198.

United States District Court,
D. Minnesota,
Fourth Division.

March 29, 1979.

Donald J. Heffernan, Connolly & Heffernan, Ltd., St. Paul, Minn., for plaintiff.

Jay L. Bennett, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for defendant.

## MacLAUGHLIN, District Judge.

This is a civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The jurisdiction of this Court is predicated on 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. § 1343(4). The case came on for trial before this Court without a jury on September 26, 1978. Donald J. Heffernan, Esq., of Connolly & Heffernan Ltd., appeared for the plaintiff. Jay L. Bennett, Esq., of Dorsey, Windhorst, Hannaford, Whitney & Halladay, represented the defendant. This Court, having heard and considered all of the evidence presented at trial, as well as the pleadings and respective memoranda of both parties, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Plaintiff Luis Morales brought this action in a timely manner alleging that his discharge from employment as a coder at the Minneapolis office of defendant violated Section 703(a) of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2(a)(1), because the termination was the result of national origin discrimination. Plaintiff is of Cuban origin, and at the time of trial was 61 years of age. In 1968, plaintiff was hired by defendant as a coder, a job function which is part of the defendant's billing department. The plaintiff was discharged from his position as a coder on January 30, 1976. Defendant Dain, Kalman & Quail, Inc., during the applicable period from 1968 to the beginning of 1976, was engaged in an industry affecting commerce and had 25 or more employees, thus being an employer under 42 U.S.C. § 2000e(b).

As a coder, plaintiff's main task was to hand record on certain "tickets" trade information regarding stock transactions. The coded or recorded ticket was then delivered to the data processing section of the company and eventually fed into the computer, which issued billing information. Another type of work normally performed by coders was known as cancelling and correcting, a function related to the correction of errors on the previously coded tickets. As coding itself was dependent on available information regarding stock transactions, a significant amount of the actual ticket coding performed in the coding section occurred in late morning and during the afternoon, because the required information concerning recordable transactions had to be transmitted from stock exchanges. Accordingly, it was a regular practice for coders to perform cancelling and correcting as well as various other duties in the morning. Also, due to the acquisition of another company by Dain, Kalman & Quail, the major portion of available overtime work for coders was comprised of cancelling and correcting duties. When the plaintiff commenced his employment at Dain, Kalman & Quail, the billing department employed six male coders. At the time of plaintiff's discharge, he was the coder in the department with the longest experience, as newer female Dain, Kalman & Quail employees had taken the place of the former male coders. Plaintiff was the only coder of Cuban origin employed at the Minneapolis office of defendant. The coder employees, including plaintiff, were assigned similar job responsibilities and worked under the same physical conditions.

The coding section of the billing department at Dain, Kalman & Quail underwent a transformation during the period when plaintiff was employed there. Towards the end of 1971, William Engebretson assumed managerial duties over the billing department, which included supervision over the coders. In 1972, Engebretson appointed Joseph Pokotylo to be the immediate supervisor of the coders. The emergence of Engebretson as the manager of the billing department in 1971 was due to certain problems perceived by management in that department. Specifically, these problems

were related to poor supervision and inadequate evaluation of employees, as well as diminished efficiency of the department as a whole, including the coding section.

■ The plaintiff claims that his discharge in early 1976 was the result of national origin discrimination, and that he was subject to verbal and other harassment by his supervisors because of his Cuban ancestry. Plaintiff's claim that he was harassed by supervisory personnel because of his Cuban origin serves as the foundation for three of plaintiff's arguments. First, plaintiff argues that evidence of verbal harassment because of national origin infers that defendant utilized impermissible considerations in the discharge decision. Second, plaintiff asserts that the reasons advanced by defendant for his discharge are ineffective because plaintiff's alleged deficiencies resulted from discriminatory harassment by defendant's supervisory personnel. Third, apart from the discharge arguments, plaintiff apparently contends that this harassment amounts to discrimination in the conditions of his employment within the meaning of Section 703(a) of Title VII. The plaintiff has also contended that his employer failed to promote him because of his Cuban ancestry.[1]

■ In his testimony, plaintiff pointed out a number of specific incidents involving supervisory personnel which serve as a basis for his argument that he was harassed and discharged because of his Cuban origin. The evidence established that William Engebretson on occasion told Morales to "speak English" and that such comments were considered offensive by plaintiff Morales.[2] The plaintiff also took offense at criticism directed to him by Engebretson concerning plaintiff's custom of inviting his fellow employees to lunch and purchasing gifts for his fellow employees, including Engebretson. As these practices were the regular custom of plaintiff, he tends to equate these practices with his ethnic origin and asserts that they reflect a discriminatory animus on the part of Engebretson.[3] As time progressed, plaintiff's relationship with Engebretson deteriorated to the point where plaintiff, in 1974 and again in 1975, had filed complaints with local or state human rights agencies charging defendant with national origin discrimination. As further evidence of Engebretson's discriminatory state of mind, plaintiff stated that Engebretson's response, upon learning of

---

1. The plaintiff has not pursued his arguments on the failure of defendant to promote him from his coder position. In a failure to promote context, to make out a prima facie case, the plaintiff must demonstrate that: 1) he or she is a member of a protected class; 2) he or she applied for and was qualified for a job for which the employer was seeking applicants; 3) despite the plaintiff's qualifications he or she was rejected; and 4) after the rejection, position remained open and the employer continued to seek applicants from persons with qualifications similar to the plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Meyer v. Missouri State Highway Commission*, 567 F.2d 804, 808 (8th Cir. 1977).

The plaintiff has failed to establish a prima facie case that defendant failed to promote him because of his Cuban ancestry. First, the evidence established that plaintiff never applied for a promotion or a particular position for which defendant sought applicants, and in fact was not inclined to leave his coder position. Also, in view of the problems which plaintiff had regarding tardiness, absenteeism and failure to cooperate with his supervisors, the defendant would have been justified in denying

plaintiff a promotion had he applied because of inadequate qualifications.

2. Engebretson testified that while he did, on occasion, tell Morales to "speak English," he did so out of frustration because of Morales' heavy accent and tendency, especially when excited, to speak very rapidly and occasionally lapse into Spanish. It was clear at trial that Morales' accent and his habit of rapid speaking, occasionally make it very difficult to understand what he is saying.

3. This Court fails to perceive any logical relationship between these incidents and plaintiff's national origin. Similarly, plaintiff's complaints regarding comments concerning his lateness and excessive time spent in the bathroom provide no foundation for an argument that plaintiff was singled out because of his ancestry. Consequently, these incidents have little probative value with respect to the question of whether Engebretson acted with a discriminatory motive. Engebretson testified that he thought it was inappropriate for him to receive gifts from Morales because as his supervisor he had to pass on Morales' job performance.

the filing of the complaint, was that the agency was "garbage." [4]

Morales also testified about certain verbal encounters he had with Joseph Pokotylo which plaintiff asserts reflect his immediate supervisor's disposition concerning his Latin American origin. Plaintiff testified to his chief complaint concerning Pokotylo as follows:

Q Now, Mr. Pokotylo was your immediate supervisor?

A Yes, sir.

Q Before this meeting took place on the fifth floor with Mr. Fadden had Mr. Pokotylo given you any trouble?

A Yes, sometimes he gave trouble to me.

Q What kind of trouble did he give you before this meeting with Mr. Fadden?

A Well, as soon as he was named supervisor he began to bother me, you know. Like once we were talking, he wasn't in the group, and when he heard us talking he came by, "What you talking about," and I told him we were talking about Latin Americans. And I told the girl the Latin American has fast thinking. Mr. Pokotylo look at me with surprise and told me, "How come?" And I told him, "What you mean, how come?" He said, "How come Latin Americans are so fast thinking when they come from Indians and the Spaniards?" I look at him, the question was so stupid and besides maybe intentional and I smile like maybe he try me.

Q I see. Well, what was your impression then of his remark? How did you feel?

A The impression is, I see, because I was a Cuban. I am not a Spik, you know, or a Polack; I am a Cuban, and I think it was some hanky-panky.

Q He said this in front of the other employees?

A Oh, yes, in the office. [5]

The evidence also established that Pokotylo made comments to plaintiff about how the company could hire women to do the plaintiff's job cheaper than what they paid plaintiff. [6]

Plaintiff alleges that he was treated differently by supervisory personnel than were his fellow coders. For instance, plaintiff claims that he was singled out in front of other employees and subjected to verbal abuse from his supervisors concerning his performance. Plaintiff asserts that other coders were not exposed to such public humiliation. Also, plaintiff alleges that other coders were not watched so closely regarding tardiness and that other coders received opportunities to do overtime work while he was denied overtime. Plaintiff also argues that other employees received merit raises while he did not and that other coders, unlike him, were not given deferred raises.

During plaintiff's employment at Dain, Kalman & Quail, a number of evaluation sessions concerning plaintiff's job performance were held. As early as January of 1973, three years prior to his discharge, plaintiff was informed at a meeting with Engebretson, Wayne Fadden (personnel di-

---

4. In his testimony, Engebretson emphatically denied that he referred to the particular agency as "garbage." Rather, Engebretson explained that he referred to the plaintiff's position on the discrimination question as "garbage." The Court finds Engebretson's interpretation of the incident to be the most plausible, and specifically finds that Engebretson referred to plaintiff's stance on the discrimination issue as "garbage."

5. Ironically, Morales' answers illustrate the same type of national origin discrimination which Morales alleges occurred during his employment with defendant.

6. As with some of the other incidents related by plaintiff, this Court finds no logical relationship between this comment and plaintiff's Cuban ancestry. Therefore, it has little probative value with respect to whether Pokotylo acted with a discriminatory intent. In his testimony, Pokotylo explained that these comments were an attempt to point out to plaintiff that as he was the highest paid coder, he should assume more responsibility in performing non-ticket coding functions which the female coders, who were paid less, regularly performed. Parenthetically, it became clear during Pokotylo's testimony that he, as well as Morales, has a heavy accent.

rector) and John Hake (Vice President of Communications) that he was tardy and absent too often, that he committed excessive coding errors and that he spent too much time away from his desk. On other occasions, Morales was urged to be more cooperative with Pokotylo and to perform essentially non-ticket coding functions when requested to do so. There were also disruptive incidents engaged in by plaintiff during working hours stemming from plaintiff's refusal or reaction to requests to perform assigned tasks other than the coding of tickets.[7] The problems which surfaced concerning Morales' job performance were recurring. The concerns of defendant over plaintiff's tardiness and absenteeism[8] became aggravated by plaintiff's back injury which he sustained in December of 1975 and which forced him to be inactive and miss work for approximately four weeks during the two months prior to his discharge.

Due to the concerns over plaintiff's job performance, defendant did not give plaintiff merit raises for the years 1974 and 1975. However, at a January 15, 1976, meeting plaintiff was informed that he would receive a "deferred" raise, i. e., that if his performance improved he would receive a raise in March of 1976. At the meeting, as he had in prior evaluations, plaintiff became upset at what he considered to be unequal treatment. It was after this meeting that the decision to terminate the employment of Luis Morales was collectively made by Engebretson, John Hake, and Don James, Vice President of Compliance and Personnel. Joseph Pokotylo, plaintiff's immediate supervisor in the coding section of the billing department, did not participate in the decision to terminate Morales' employment. The termination decision was based on the recurring problems concerning plaintiff's job performance which initially surfaced in 1973. Plaintiff was informed of his dismissal on January 30, 1976.

The defendant justified the termination of Morales on a number of grounds. Evidence offered by defendant clearly established that plaintiff, when compared to other coders, was tardy more, absent more,[9] spent more time away from his desk, committed excessive errors and was uncooperative by consistently refusing to perform non-ticket coding functions when requested to do so by supervisors or others.

Patricia Wilmot and Corrine Hallquist, both of whom worked alongside the plaintiff and were called as witnesses on behalf of plaintiff, corroborated these claims of defendant. For example, Ms. Hallquist testified that Morales came late to work more often than the other defendants, that when he did arrive he did not start work immediately but would go "to the washroom or wherever he went" and that he spent more time away from his desk during the working day than did other employees. She further testified that she never heard anyone refer to the way Morales spoke and she never heard anyone publicly chastise Morales about his conduct or errors. She said that she also was "called in" by the supervisor from time to time to discuss her errors.

7. For example, plaintiff's immediate supervisor, Joseph Pokotylo, testified to a number of disruptive incidents. On two occasions in June of 1975, Pokotylo stated that he asked Morales to assist in performing other duties and plaintiff became boisterous and angry, stating that he was only hired to code tickets. On one such occasion plaintiff became so angry he left work at 10:40 a. m. and didn't return. Moreover, Pokotylo stated that plaintiff consistently refused to learn how to perform cancelling and correcting duties. In his own testimony, plaintiff concluded that he was hired only to code tickets and therefore he considered the assignment of other non-coding duties unfair. However, the evidence conclusively showed that all of the other coders did perform the requested non-coding duties.

8. Plaintiff was absent 35 days from work during 1975 and was tardy on at least 42 other days during 1975. Plaintiff was absent 5 days during January of 1976.

9. The Court takes no position as to whether defendant's reaction to absenteeism and tardiness is appropriate or inappropriate, but notes that the evidence established that defendant's reaction to those two elements was the same to all employees and was not based upon any discrimination against Morales because of his national origin.

Mrs. Wilmot, also called by Morales, testified that Morales had numerous errors in his work; that he was often tardy and more so than other employees; that all coders were closely watched so far as when they arrived at work; that Morales was away from his desk during working hours more than the other coders; and that Morales at times refused to perform other duties which the remaining coders did perform. She also stated that she had never heard any references to Morales' ability to speak English or to his Cuban ancestry, nor did she ever hear the supervisor chastise Morales in the presence of other employees.

Even the plaintiff, in his testimony, indicated that he refused to perform requested assignments if they did not involve the coding of tickets, as he considered it unfair. Evidence offered by defendant also demonstrated that plaintiff's non-cooperation, absenteeism, tardiness and high error ratio had a detrimental effect on the billing department, from both an efficiency and morale standpoint.

■ The relevant statutory provisions in this case include Section 703(a) and Section 706(g) of Title VII of the 1964 Civil Rights Act. Section 703(a)(1)[10] of Title VII provides:

It shall be an unlawful employment practice for an employer—

(1) to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . . .

Section 706(g)[11] of Title VII provides in part:

No order of the court shall require . . . reinstatement of an individual . . . as an employee, or the payment to him of any back pay, if such individual was . . . discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of [retaliation provisions].

**10.** 42 U.S.C. § 2000e–2(a)(1).

The term "national origin" as used in Title VII "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). Thus, for plaintiff to be entitled to reinstatement or back pay, plaintiff must show that his discharge was because of his Cuban ancestry, not merely that the termination was unfair in some respects.

■ In a Title VII case involving allegations of individual instances of discrimination, the plaintiff possesses the initial burden of establishing a prima facie case. *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977). A prima facie case and an ultimate finding of discrimination are distinct concepts. In the disparate treatment theory of discrimination pursued here, a prima facie case is "simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely thatnnot those actions were bottomed on impermissible considerations." *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978); *Meyer v. Missouri State Highway Commission,* 567 F.2d 804, 807 (8th Cir. 1977). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to demonstrate legitimate nondiscriminatory reasons for his conduct. The plaintiff must then be provided with an opportunity to show that the employer's reason for the action complained of was a pretext for prohibited discrimination. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977); *Henry v. Ford Motor Co.,* 553 F.2d 46 (8th Cir. 1977). The employer in such cases can prevail on the merits either by refuting "the existence of a prima facie

**11.** 42 U.S.C. § 2000e–5(g).

case by showing to be non-existent the facts upon which the inference of discrimination is sought to be sustained" or by showing that "his actions were taken for legitimate reasons, thereby rebutting the inference of discrimination created by plaintiff's prima facie case." *Mosby v. Webster College,* 563 F.2d 901, 903–04 (8th Cir. 1977).

■■■■ A prima facie case is established in the discharge context [12] if plaintiff shows that he is a member of a protected class, that he was discharged from his position and "if the net of the evidence adduced by both parties leaves the fact finder convinced that there has been disparate treatment between a member of a [protected class] and others not of that group . . . ." *Henry v. Ford Motor Co.,* 553 F.2d 46, 48–49 (8th Cir. 1977). Viewing the evidence presented by both parties which relates to the existence of facts upon which plaintiff infers that discrimination is present, it cannot be fairly said that plaintiff has established a prima facie case as he has failed to show that there has been disparate treatment or a discriminatory animus [13] on the part of the defendant. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Meyer v. Missouri State Highway Commission,* 567 F.2d 804, 807, n. 4 (8th Cir. 1977); *Mosby v. Webster College,* 563 F.2d 901, 903, n. 2 (8th Cir. 1977); *Henry v. Ford Motor Co.,* 553 F.2d 46, 48–49 (8th Cir. 1977). Even assuming, however, that plaintiff's proof established a prima facie case so as to shift the burden to the defendant to demonstrate valid non-discriminatory rea-

sons for its action, the substantial proof offered by defendant effectively and conclusively established that Luis Morales was terminated for legitimate non-discriminatory reasons. Nor did the reasons propounded by defendant for its actions amount to a pretext for prohibited discrimination. Thus, the evidence as a whole shows that the conduct of defendant was not based on plaintiff's Cuban ancestry but on valid business judgment and discretion. *Harmon v. May Broadcasting Co.,* 583 F.2d 410 (8th Cir. 1978); *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977).

The evidence established that plaintiff was not a victim of disparate treatment. It is not disputed that other coders worked under the same physical conditions as the plaintiff. It was shown by defendant that other coders had been terminated, denied merit raises, or given deferred raises because of excessive absenteeism, tardiness or poor performance, some of the same reasons used to justify such action with respect to the plaintiff. Moreover, plaintiff's claim that he was criticized in public concerning his performance while other coders were not subject to public censure must be rejected, as plaintiff has failed to show that this in fact occurred. None of the witnesses called by plaintiff recalled any incidents where plaintiff was publicly rebuked concerning his performance. Nor was plaintiff singled out by his supervisors with respect to being watched for infractions of company rules, as the evidence established that all the coders were watched closely by supervisory personnel for tardiness. Pokotylo tes-

---

12. The defendant has argued that it is necessary for the plaintiff to show, as a part of his prima facie case, that he was satisfactorily performing his job. Defendant asserts that plaintiff's proof failed in this respect, and consequently plaintiff has failed to establish a prima facie case of discrimination. In *Flowers v. Crouch Walker Corp.,* 552 F.2d 1277 (7th Cir. 1977), the court held that the plaintiff employee must make some showing of satisfactory performance in order to raise an inference that the defendant engaged in prohibited discrimination when it discharged the plaintiff from employment. The Court, while it agrees with defendant as a factual matter that plaintiff failed to show that he was performing as a coder in a satisfactory manner, finds it unnecessary to decide whether such a requirement should be imposed upon the employee as part of establishing a prima facie case.

13. The plaintiff here has proceeded under the disparate treatment model of discrimination. As the Supreme Court noted in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15 52 L.Ed.2d 396 (1977), proof of "discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment" under this type of discrimination.

tified, and his testimony was supported by several other witnesses, that one of his specific duties was to see that the coders came to work on time and that all coders were treated the same in this respect. He testified that tardiness was particularly significant in the coding section because certain work had to be performed first thing in the morning before the stock exchange in New York opened for the day.

With respect to plaintiff's claim that he was denied the opportunity to work overtime and that this denial reflects disparate treatment on the part of the defendant, the evidence established that the bulk of the overtime work was comprised of non-ticket coding functions, such as cancelling and correcting. Throughout his employment at Dain, Kalman & Quail, plaintiff consistently refused to learn to perform this type of work and often created disruptions in the billing department with his refusal to perform assigned non-ticket coding duties. As the plaintiff repeatedly expressed his desire not to perform such duties and only to code tickets, his supervisor did not ask him to engage in overtime work. Plaintiff's lack of overtime resulted instead from his own inflexibility in regularly refusing to perform such duties. Thus, plaintiff has failed to show by a preponderance of the evidence that he was treated differently than similarly situated coder employees.

 Plaintiff, however, points to other factors which he asserts reflect a discriminatory animus on the part of his employer with respect to the termination decision. First, plaintiff argues that he was subject to verbal abuse from supervisory personnel of defendant, and that this abuse reflects that his supervisors utilized impermissible considerations in the discharge decision. Specifically, plaintiff points to Pokotylo's comments regarding fast thinking Latin Americans and Engebretson's demands on plaintiff to speak English. Derogatory comments directed to an employee by supervisory personnel regarding the employee's ancestry can amount to an unlaw-

ful employment practice under Title VII provided the comments are sufficiently "excessive and opprobrious." *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir. 1977); *Rogers v. Equal Employment Opportunity Comm'n,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). The comments regarding plaintiff's use of the English language and fast thinking Latin Americans are not sufficiently excessive or disgraceful to amount to a violation of Title VII. With respect to Engebretson's demands on plaintiff to speak English, this Court is not inclined to view such demands as reflecting a discriminatory animus on the part of Engebretson as the evidence established and it is apparent that plaintiff reverts to Spanish occasionally and is perhaps more prone to do so when he becomes upset. Insofar as the termination decision is concerned, the evidence established that Pokotylo was not a participant in the decision, and consequently his isolated comment has little bearing on the discharge of plaintiff. Moreover, the comment itself does not necessarily reflect a discriminatory intent towards plaintiff on the part of Pokotylo, nor should such an isolated comment necessarily be attributed to the employer as reflecting the defendant's attitude towards plaintiff. *See Friend v. Leidinger,* 446 F.Supp. 361 (E.D. Va.1977).

 Plaintiff also argues that the timing of the termination decision infers discrimination on the part of defendant. Specifically, plaintiff argues that the discharge decision was based upon his performance over a three-week period from late December, 1975, to the third week of January, 1976. During this time, plaintiff was in the process of recovering from a back injury and was absent from work 12 days. In *Lowry v. Whitaker Cable Corp.,* 348 F.Supp. 202, 214 (W.D.Mo.1972), *aff'd* 472 F.2d 1210 (8th Cir. 1973) the court held that where the employer deviated from its normal practice in discharging an employee who had been employed for a period of only 19 days, this

time period could be considered in determining whether racial discrimination was present. The *Lowry* decision, relied upon by plaintiff, is inapposite here. It is readily evident that the defendant's decision to discharge plaintiff was not based on a three-week period, but rather a three-year period in which plaintiff was repeatedly encouraged to improve with respect to the same problems regarding cooperation, absenteeism, tardiness and coding errors. Consequently, plaintiff's argument must be rejected. Therefore, as plaintiff has failed to show by a preponderance of the evidence that there has been disparate treatment or that there exist facts which infer the requisite discriminatory intent on the part of defendant, plaintiff has failed to establish a prima facie case.

The defendant established that for over three years prior to his discharge, Luis Morales was repeatedly warned about his shortcomings in terms of excessive errors, non-cooperation in performing duties other than ticket coding, absenteeism, and tardiness. Moreover, when informed of these concerns at evaluation sessions, plaintiff was often hostile and uncooperative. The evidence established that plaintiff was comparatively more tardy, was away from his desk more, had a higher error ratio than other coders and consistently failed to cooperate in carrying out assigned duties. Rather than being the result of national origin discrimination, the termination decision was based on the above legitimate non-discriminatory reasons which did not amount to a pretext for prohibited discrimination. *Miller v. Weber,* 577 F.2d 75 (8th Cir. 1978) (excessive tardiness); *Stevens v. Junior College District of St. Louis—St. Louis County,* 548 F.2d 779 (8th Cir. 1977) (poor performance); *Garrett v. Mobil Oil Corp.,* 531 F.2d 892 (8th Cir.), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976) (disruptions, bypassing supervisors and leaving the work area); *Reed v. Arlington Hotel Co.,* 476 F.2d 721 (8th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973) (refusal to perform required duties).

Plaintiff argues that because he had previously brought discrimination charges on two occasions against defendant's employees, and because management personnel were aware of his back injury, the defendant unlawfully retaliated by discharging him for asserting his statutory rights. 42 U.S.C. § 2000e–3(a); Minn.St. § 176.82. Insofar as the worker's compensation claim filed by plaintiff is concerned, this claim was not filed by plaintiff until almost nine months after the January 30, 1976, discharge. Consequently, defendant cannot reasonably be charged with obstructing or discharging an employee who has sought worker's compensation benefits within the meaning of Minn.St. § 176.82. Plaintiff brought employment discrimination charges with local and state agencies on two occasions, first in July of 1974 and then in July of 1975. Basically, these charges alleged that his supervisors harassed him and that he was denied raises because of his national origin. Plaintiff also expressed his intentions to charge defendant's supervisory personnel with national origin discrimination on a number of occasions, particularly during evaluation sessions and when he was asked to perform non-ticket coding functions. The fact that a charge of discrimination has been filed or threatened by an employee does not immunize the employee from being discharged because of inadequate performance, absenteeism or other non-discriminatory reasons. *Brown v. Ralston Purina Co.,* 557 F.2d 570 (6th Cir. 1977); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir. 1976). The defendant's supervisory personnel cooperated with the local and state agencies regarding the charges brought against them by plaintiff, and expressed the same concerns regarding plaintiff's work habits and performance to officials of the agencies as they did to plaintiff beginning in 1973. Moreover, defendant's management personnel from 1973 forward provided the plaintiff with ample opportunities to show the specifics relating to his discrimination charges and investigated plaintiff's complaints regarding harass-

ment.[14] This Court has concluded that the filing of discrimination charges or plaintiff's expressions of his intent to do so played no role in the defendant's decision to discharge plaintiff.[15] Rather, plaintiff was discharged for legitimate non-discriminatory reasons.

The plaintiff has alleged that he was harassed by Engebretson and Pokotylo, that this harassment was motivated by plaintiff's Cuban ancestry, and that this harassment amounted to discrimination in the plaintiff's "conditions . . . of employment" under Section 703(a). Plaintiff also argues that because of this harassment, his effectiveness as a coder was diminished, and that his tardiness and absenteeism were in turn caused by the harassment emanating from defendant's supervisory personnel. Plaintiff, drawing an analogy to cases involving constructive discharge, asserts that where an employer makes working conditions intolerable for an employee, the employer's conduct is a factor to be considered in determining whether the employee can be charged with poor performance. *See* *Muller v. U.S. Steel Corp.,* 509 F.2d 923, 929 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975). Thus plaintiff reasons, the justification asserted by defendant for his termination is insufficient to serve as valid non-discriminatory reasons under Title VII as these reasons were brought about by discrimination engaged in by defendant.

Even assuming that plaintiff's theory is valid, it must be rejected here as it is factually unsupportable. First of all, plaintiff was not "harassed" in the sense that the defendant deliberately attempted to demean the plaintiff before his fellow employees or to render his working conditions intolerable. *Id.; Compston v. Borden, Inc.,* 424 F.Supp. 157, 160–61 (S.D.Ohio 1976). The efforts of defendant's supervisory personnel

to evaluate plaintiff or have him improve his job performance cannot be characterized as unlawful harassment. Second, even assuming that plaintiff was subject to "harassment" by his supervisors, the evidence established that any conduct engaged in by plaintiff's supervisors which was directed to plaintiff was motivated by and the result of recurring problems concerning his job performance, not because of his Cuban ancestry. In *Compston v. Borden, Inc.,* 424 F.Supp. 157 (S.D.Ohio 1976), the court held that where a supervisor engaged in a course of conduct calculated to demean an employee *because of* the employee's religion, the supervisor's conduct amounted to discrimination in the conditions of the plaintiff's employment under Section 703(a). Here, unlike *Compston,* any "harassment," assuming its existence, and the Court believes the evidence does not support the allegation of harassment, was not because of plaintiff's ancestry, but resulted from his performance. The respective verbal comments by Engebretson and Pokotylo regarding plaintiff's failure to speak English and fast thinking Latin Americans are insufficient to show that any harassment undertaken by defendant's supervisory personnel was because of his Cuban ancestry. As plaintiff has failed to show that he was treated differently than his fellow coders and has pointed out no other facts sufficient to show that any harassment was undertaken because of his Cuban origin, his proof has failed to show that defendant's supervisors were motivated by plaintiff's ancestry in any harassment of plaintiff. Absent a discriminatory animus, any harassment of plaintiff cannot serve as a defense by an employee to charges of poor performance. *Compston v. Borden, Inc.,* 424 F.Supp. 157 (S.D.Ohio 1976). Thus, plaintiff has failed to show that he was discriminated against because of his Cuban

14. Contrary to plaintiff's assertions, the evidence established that defendant's management made a reasonable investigation of Morales' charges of discrimination, which included inquiries concerning the alleged harassment of plaintiff by Joseph Pokotylo.

15. Thus, the pending discrimination charges and plaintiff's expressions of his intent to file further charges, even when considered with all the other facts from which plaintiff infers that discrimination is present, is insufficient to establish a prima facie case of discrimination.

ancestry with respect to the conditions of his employment under Section 703(a), and the reasons articulated by defendant as the justification for the discharge of plaintiff are not rendered ineffective by any conduct of defendant.

 The Court has considered all of the other arguments raised by plaintiff and finds them to be untenable.[16] For all of the foregoing reasons, this Court has concluded that the plaintiff was not discharged or discriminated against in the conditions of his employment because of his Cuban ancestry. Rather, the defendant's treatment of plaintiff was based on legitimate non-discriminatory reasons, and these reasons were not shown to be a pretext for prohibited national origin discrimination. Accordingly, there has been no conduct by the defendant which constitutes an unlawful employment practice violative of Title VII of the 1964 Civil Rights Act.

LET JUDGMENT BE ENTERED ACCORDINGLY for defendant Dain, Kalman & Quail, Inc.

---

16. As plaintiff is entitled to no relief, his request for attorney's fees must be denied, as such an award can only be made to a "prevailing party" under 42 U.S.C. § 2000e–5(k). It should be pointed out that this case was well tried by both counsel, and that plaintiff was afforded able representation by his attorney. Although a prevailing party, this Court denies defendant's request for attorney's fees. *Christianburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).