In re UNITED CEREBRAL PALSY
ASSOCIATIONS OF NEW YORK
STATE, INC., Debtor.

Ali A. RAZAGHI, Plaintiff,

v.

UNITED CEREBRAL PALSY ASSOCIA-
TIONS OF NEW YORK STATE, INC.,
Robert Schonhorn, and Joe Tryan, De-
fendants.

Bankruptcy No. 83 B 11496 (PBA).
Adv. No. 85–5650A.

United States Bankruptcy Court,
S.D. New York.

March 12, 1986.

Vann & Borenstein, P.C. by Abraham Borenstein, New York City, for Ali A. Razaghi.

Roberts & Finger by Joel L. Finger, New York City, for United Cerebral Palsy Associations of New York State, Inc., Robert Schonhorn and Joseph F. Tryan.

Levin & Weintraub & Crames by Mitchel H. Perkiel, New York City, for debtor in possession.

## MEMORANDUM DECISION GRANTING SUMMARY JUDGMENT AND EXPUNGING CLAIM

PRUDENCE B. ABRAM, Bankruptcy Judge:

Ali A. Razaghi ("Razaghi"), a former employee of United Cerebral Palsy Associations of New York State, Inc. ("UCP"), the debtor, has filed a proof of claim for $1 million in this now-confirmed Chapter 11 case asserting that his pre-petition discharge by UCP on March 5, 1983, was the result of unlawful discrimination on the grounds of age, race, color, sex and national origin.[1] Discovery has been completed.

The three defendants in the adversary proceeding, UCP and two of its employees,[2] have moved for summary judgment in their favor. The case has been ably argued by both sides. The court grants the defendants' motion for summary judgment and expunges Razaghi's claim as the court finds the evidence offered in support of the alleged discrimination legally insufficient to support a conclusion of unlawful employment discrimination.

UCP is a not-for-profit corporation engaged in providing, *inter alia*, direct care services, including health care, education, day treatment, residence, and transportation to residents of New York State with developmental disabilities, including mental retardation and/or physical disabilities. UCP is funded through the joint federal-state Medicaid system and its reimbursement rates are determined by New York State. In 1981 and 1982, New York State reduced its reimbursement rates to UCP, while maintaining the same level of mandatory services UCP had to provide to its clients. The reduction in the State reimbursement rates caused UCP to suffer severe financial difficulties which, *inter alia*, resulted in UCP filing for reorganization under Chapter 11 on October 14, 1983 and in UCP laying off 463 employees in 1983, among whom was Razaghi.

Razaghi was hired by UCP on January 2, 1979 as a Payroll Bookkeeper in the Financial Department. As a Payroll Bookkeeper, Razaghi's primary responsibilities were preparation of payroll data and answering questions and supplying payroll-related information to UCP employees. Because of Razaghi's inability to avoid disputes with other UCP employees, in 1980 Razaghi was instructed by his then supervisor to restrict his use of the telephone with other employ-

---

1. The pleadings in the adversary action do not refer to national origin discrimination. At oral argument counsel for Razaghi stated that he had always regarded this case as being a national origin case at its heart. Razaghi's proof of claim does refer to national origin discrimination. Although no formal request for leave to amend the adversary complaint has been made, the court considers the national origin issue to

have been fairly raised and that this issue is properly before the court for resolution.

2. The two individual defendants are Robert Schonhorn ("Schonhorn"), the Executive Director of UCP, and Joseph F. Tryian ("Tryian"), the Director of Finance of UCP.

ees. Razaghi's responsibility for responding to or interacting with UCP employees regarding payroll matters was assigned to other Payroll Unit employees. At the time of his discharge, Razaghi held the position of Senior Payroll Bookkeeper, a position to which he was promoted effective January 2, 1981. Although one of the responsibilities of the Senior Payroll Bookkeeper position was also to respond to and interact with UCP employees and others regarding various payroll matters, this responsibility continued to be assigned to others because of Razaghi's inability to avoid disputes.

Until in or about October 1982, Victoria Palumbo was the Payroll Supervisor; thereafter Rose Marie Brunetti became the Payroll Supervisor and began supervising Razaghi. On their annual evaluations of Razaghi, both supervisors noted communication problems in Razaghi's interaction with other employees. Brunetti prepared a performance evaluation on January 11, 1983, which was shortly before Razaghi's termination, on which she evaluated Razaghi as below average in the categories of "Dependability" and "Courteous to Fellow Employees." In addition, Brunetti stated: "Al has no patience with fellow employees, especially when questioned about benefits due them." On January 20, 1983, Razaghi requested a meeting with Tryrian, UCP's Director of Finance [3] and one of the individual defendants, to discuss the performance evaluation "so that I may personally prove the value of my services, etc."

Shortly thereafter, and on January 29, 1983, Razaghi was given a final warning that unless his attitude and the ways in which he dealt with other employees improved immediately he would be terminated. This warning resulted from a complaint that Razaghi had twice hung up the telephone on a facility administrator who had called the payroll office regarding a problem. The memorandum noted that Razaghi had been counseled about his improper attitude in dealings with employees over the telephone on July 22, 1981 and that the

matter had been noted on his yearly evaluations for 1980, 1981 and 1983.

Razaghi responded to the warning with a memorandum dated January 30, 1983 in which he did not deny hanging up the telephone. He stated in part:

"I am writing this reply in an effort to end the controversy concerning my attitude.

"I have had frequent conversations with Mr. J. Tyrian involving my work with the payroll. On many occasions, I have received requests for benefits beyond those permitted by the agency. As per my responsibilities to my position, I have altered the benefits to befit the regulations. This has caused understandable discomfort among the recipients of said benefits. This discomfort has led to some degree of hostility toward my position.

"Mr. Tyrian has been aware of these circumstances and, in an effort to alleviate the pressures caused by them, told me to refrain from corresponding with employees over the telephone."

Subsequent to issuance of the final warning, Brunetti received a complaint from the Employee Services Supervisor at one of UCP's centers about Razaghi's handling of a telephone inquiry on January 31, 1983 in which Razaghi declined to assist in attempting to locate some missing checks. The memorandum stated that on a number of prior occasions Razaghi had refused to assist inquiries and hung up the telephone mid-way through the conversation.

Razaghi was one of six employees in the Finance Department laid off on March 5, 1983 as part of a general staff reduction recommended by a committee of senior administrators and adopted by Schonhorn as a way of reducing UCP's operating costs and improving its short term cash flow problem. Prior to that layoff, there were thirty employees in the Finance Department, ten (10) or 33% of whom were white. After the March 5 layoff, there were twenty-four (24) employees in the Finance Department, eight (8) or 33% of whom were

---

3. This position was previously referred to as comptroller.

white. Of the six employees laid off, two (including Razaghi)[4] were white, two were black, one was Hispanic and one was Asian. Three of the six were men and three women.

Tyrian selected Razaghi for layoff. He selected Razaghi for layoff because of Razaghi's inability to respond effectively to and interact with UCP employees regarding various payroll matters, a primary function of the Senior Payroll Bookkeeper position. As a consequence of having this problem, Razaghi was, prior to layoff, performing only clerical payroll work, and others in the Payroll Unit were performing those of the Senior Payroll Bookkeeper's tasks that required interaction with other UCP employees. Tyrian believed that reassigning those responsibilities to Razaghi would have decreased the effectiveness and productivity of the Finance Department. This belief was plainly not unreasonable in light of the recent complaints about Razaghi's telephone behavior. Conversely, by selecting Razaghi, Tyrian merely redistributed the clerical work being performed by Razaghi to the remaining Payroll Unit employees. Compare, *Morales v. Dain, Kalman & Quail, Inc.*, 467 F.Supp. 1031, 1040, 1042 (D.Minn.1979) (Plaintiff's lack of overtime resulted from his own inflexibility and expressed desire not to perform certain tasks he did not believe to be part of his job and not from discrimination and the evidence established that any conduct engaged in by plaintiff's supervisors was motivated by and the result of recurring problems concerning his job performance, not his national origin.)

■ Razaghi has offered no proof in support of his allegation of age discrimination. UCP states that Razaghi's position was eliminated. Even if his work were reassigned to a younger worker, mere proof of this fact is insufficient to establish age discrimination since a majority of all workers would be younger than Razaghi.

■ Likewise, Razaghi's proof of sex discrimination is insufficient. Razaghi states that he was replaced by a man but alleges that the Department Head was biased in favor of hiring women. The only statistical evidence is that the layoffs were sex neutral.

■ To the extent that race or color discrimination is separate from national origin (as it may be in some cases) Razaghi has adduced no proof tending to show discrimination on these grounds. The laid off employees were equally balanced on these grounds with retained employees.

This case then comes down to consideration of Razaghi's national origin discrimination claim. Razaghi was born in Russia in 1918. As a child, he immigrated to Iran where he lived for forty years. He has lived in the United States for the past twenty-one years. Razaghi, who considers himself an American, asserts that he was terminated by UCP as a result of hostility and discrimination against him as an Iranian. He is not an Iranian by birth nor is there any allegation that his parents were Iranian. This might be fatal to his claim but the court need not reach this issue. See *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.") In support of his allegations of discrimination, Razaghi points to conversations with Tyrian and Palumbo, Razaghi's then supervisor, in November and December 1979 concerning the hostage situation in Iran. According to Razaghi,

"They both displayed great hostility towards Iran and a hatred towards Iranians in general. On one occasion Ms. Palumbo told Mr. Tryian concerning myself 'He is Iranian. We should keep him hostage.'" Affidavit of Ali A. Razaghi in Opposition to Motion for Summary Judgment Sworn to November 4, 1985.

Razaghi considers himself to be of the white race, although he has a dark skin coloration.

---

4. Tyrian has stated that he considered Razaghi's race to be white at the time of Razaghi's layoff.

■ These alleged conversations in late 1979, over three years prior to Razaghi's termination, about a then highly topical and much discussed subject are too remote in time and indefinite in content to support Razaghi's inference of national origin discrimination. Following the time period in which these conversations occurred, Razaghi received a promotion, pay increases and average performance ratings. Palumbo to whom the statements are attributed did not even participate in the layoff decision. *Accord,* see *Morales v. Dain, Kalman & Quail, supra.*

■ In order for Razaghi to prevail on his complaint of national origin discrimination, Razaghi must make out a *prima facie* case of discrimination and must show that the articulated reason for his dismissal is a mere pretext for dismissal for a discriminatory reason. See *Meiri v. Dacon,* 759 F.2d 989, 994 (2d Cir.1985) (If the plaintiff succeeds in proving a *prima facie* case of discrimination, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.) Razaghi has not made out a *prima facie* case of discrimination. Even if he had, he has failed to show that UCP's articulated business reasons for his termination were a mere pretext for discrimination.

■ To advise Razaghi of his termination, UCP delivered a form letter dated February 17, 1983 over the signature of Schonhorn, UCP's Executive Director and an individual defendant, identical to the letters delivered to other terminated employees that states,[5] in part:

"I want you to know that this action is in no way related to the quality of your work, performance or dedication to the people we serve. The decisions regarding which employees had to be let go were made strictly in accordance with those services for which the State has reduced funding and the seniority of each employee in the categories which had to be reduced to meet the State mandates."

In light of the warning given to Razaghi just two weeks previously, it is apparent that the February 17 form letter overstated UCP's satisfaction with Razaghi. However, that UCP chose to terminate Razaghi, an employee at will, as part of a mass layoff, instead of for cause does not create a cause of action for unlawful discrimination. Indeed, it is to an employee's benefit in securing future employment, as well as unemployment benefits, that his termination is stated to be as a result of a general layoff instead of for cause.

Razaghi has also alleged that he was improperly denied an opportunity to obtain another position with UCP at the time of the layoff and that Schonhorn refused to meet with him regarding his layoff. Tyrian did meet with Razaghi on several occasions in late February. As a result of the mass layoffs, there was a great deal of unrest at UCP and concerns arose over the personal safety of Schonhorn and others. As a result, access to Schonhorn was limited. While it may have distressed Razaghi to be unable to address Schonhorn and others over his termination, it in no way affects the propriety of Razaghi's termination. Moreover, on a practical level, it is apparent that Schonhorn had important and continuing duties as Executive Director in managing UCP at a time of crisis and that the time required for individual

---

5. Razaghi also received a memorandum of the same date from Schonhorn to all staff which stated in part:

"We want to assure you that the decisions regarding employees who have been let go were made in order to impact as little as possible on direct client care. Accordingly, a significant number of administrative support and clerical positions have been eliminated. Employees in those positions who have seniority with the agency are being given an opportunity to fill other positions in their field so that all of the employees who have been let go are either on probation or have the least seniority with the agency."

meetings with terminated employees would have been prohibitive.

As to the question of an alternative position, the court finds that Razaghi was the only person in his given category and therefore the least senior. There were no equivalent positions available. Razaghi refused to consider a lesser position and never applied for such a position. As to a more senior position, Razaghi was not entitled to oust an occupant and was, in any event, unqualified by education or ability for the senior positions, all of which required a college degree, which Razaghi does not possess, and the ability to communicate by telephone effectively and without undue conflict. There is no evidence to support a finding of prohibited discrimination relative to employment in an alternative position.

Even if Razaghi's difficulties with telephone communication were at least in part linguistic, and thereby related to his national origin, discrimination on the grounds of actual performance is not prohibited if the required task is a bona fide job qualification. See *Mejia v. New York Sheraton Hotel*, 459 F.Supp. 375 (S.D.N.Y. 1978), *aff'd in pertinent part*, 21 FEP Cases 981 (2d Cir.1979), *on remand*, 476 F.Supp. 1068 (S.D.N.Y.1979). Here the task was a bona fide job qualification. An employer is entitled to require an employee to perform his job to the reasonable satisfaction of the employer. Razaghi's position was one that required him to prepare payroll and pass on various matters such as personal and sick leave. It is apparent from Razaghi's memorandum of response to the final warning, part of which is quoted above, that Razaghi did not see his problem as having a linguistic origin. Indeed, Razaghi appears to have viewed his communication difficulties as an immutable and inalterable result of the very nature of his job.[6] Razaghi's job problems were at-tributable solely to Razaghi's personal abilities as it is apparent that many people, including other members of UCP's Payroll Unit, were and are able to deliver bad news as a regular part of their positions without getting into disputes. He was selected for layoff in a time of acute financial crisis because his job performance made him the most dispensable. Compare *Meiri v. Dacon, supra*.

UCP and the individual defendants' motion for summary judgment must be granted as Razaghi has failed to offer legally sufficient proof of a prohibited discriminatory reason for his termination and has failed to demonstrate that UCP articulated business reason was a mere pretext for a discriminatory reason. Razaghi's proof of claim will be expunged.

The debtor is directed to settle an appropriate order.

---

6. Razaghi's memorandum in response to the final warning states, in part,

"I have tolerated a number of complaints similar to [this one] * * *, even though they have caused great emotional stress. Through my many years of experience with different people, I have been able to understand the difficulties caused by my position and deal with the complaints."