**Obatala OMBU, Plaintiff,**

v.

**CHILDREN'S TELEVISION WORKSHOP, Defendant.**

**No. 80 Civ. 2491.**

United States District Court, S. D. New York.

June 15, 1981.

Obatala Ombu, pro se.

Gilbert, Segall & Young, New York City, for defendant; Howard Wilson, David E. Ross, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Obatala Ombu, a black male, brings this action against his former employer, Children's Television Workshop ("CTW"), alleging discrimination in his discharge and in various conditions and terms of employment because of his race and sex in violation of Title VII of the Civil Rights Act of 1964.[1] Defendant now moves for summary judgment. Plaintiff responded to this motion with a factually detailed memorandum of law but with no affidavit. Since plaintiff is proceeding pro se, however, the Court will treat the factual statements in this memorandum as if they were properly alleged in affidavit form.[2] As the following discussion demonstrates, plaintiff's memorandum raises material, factual disputes on several issues; on the other hand, as to other issues, no material factual dis-

putes exist and defendant is entitled to judgment in its favor. Accordingly, summary judgment is granted in part and denied in part.

In July 1978, plaintiff was employed at CTW as a full-time Research Assistant with its Sesame Street television program. Because the work at Sesame Street permitted flexible hours, plaintiff was allowed to condense a full-time, five-day, 35-hour work week into a four-day week with full-time pay from September 1978 until May 1979 to enable him to attend classes toward his Ph.D.[3] Plaintiff was the only employee at CTW who was accorded this privilege. In May 1979, as a result of budget cuts, defendant decided to eliminate one of two Research Assistant positions at Sesame Street. However, at the same time, defendant was launching a new project, the publication of a science magazine called "3–2–1 Contact," which required a Research Assistant. Plaintiff thus was transferred from Sesame Street to the science magazine. In September 1979, plaintiff announced his purpose to work other than a normal work week during the fall semester because of his "continued efforts to enhance [his] future role in higher education,"[4] however, the schedule he proposed amounted to only 32 hours per week instead of the normal 35 hours, and included time off during normal business hours on three separate days.

Defendant explained to plaintiff that, because a major portion of the duties of the science magazine position included teamtesting children during school hours, his proposed schedule was incompatible with his new job requirements. Initial conciliation efforts on the part of defendant were rebuffed by plaintiff. Shortly thereafter, as a result of a new opening at the Sesame Street Research Department, defendant of-

---

1. 42 U.S.C. § 2000e–2.

2. Cf. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Martin v. Merola*, 532 F.2d 191, 198 n.5 (2d Cir. 1976); *Young v. Scully*, 515 F.Supp. 8 (S.D.N.Y.1981).

3. There is some dispute over whether plaintiff was required to make up the work hours lost during his day off.

4. This particular semester, plaintiff planned to accept outside employment as an adjunct instructor rather than continue his Ph.D. studies.

fered plaintiff his old job on the same terms and conditions he had previously enjoyed, including the opportunity to pursue the flexible work schedule he sought. Defendant explained, however, that if plaintiff chose to stay at the science magazine he would be permitted only a limited number of hours off per week during normal working hours. Plaintiff refused both of these options, and in defiance of the direct instructions of his superiors, commenced to follow the schedule he had unilaterally devised while retaining his science magazine job. Defendant attempted once again to reach a compromise with plaintiff, but plaintiff persisted in his position. As a result he was officially terminated from his job in October 1979. Plaintiff now challenges this dismissal, as well as various other aspects of his employment with CTW, as discriminatory.

In essence, plaintiff's claims are of disparate treatment, and thus must be analyzed under the three-step approach outlined in *McDonnell Douglas Corp. v. Green*.[5] Plaintiff also claims that his discharge was in retaliation for his having filed a charge of discrimination with the EEOC in June 1979, in violation of 42 U.S.C. § 2000e–3. The order and allocation of proof in a retaliation suit is generally the same as in a discrimination suit under Title VII.[6]

*TERMINATION*

■ To establish that his discharge was due to racial or sexual discrimination, plaintiff must show, among other things, that he satisfied normal work requirements.[7] Plaintiff has submitted evidence that the quality of the work he performed was generally satisfactory. Although some criticisms of his performance are noted, plaintiff need not show perfect or even average performance but only that his performance was of sufficient quality to merit continued employment.[8] Nevertheless, defendant contends that plaintiff's insubordination in unilaterally adopting his proposed 32-hour work week, contrary to the instructions of his superiors, is a sufficient, nondiscriminatory reason for his discharge.[9] Plaintiff attempts to rebut this valid basis for his discharge (1) by arguing that Guy Minard of CTW's Personnel Department said to him that CTW did not have a policy against a permanent employee working a 32-hour week and that permanent employee status was based on at least a 32-hour work week, (2) by noting that Jane Clarke, the Assistant Director of the science magazine's Research Department, plaintiff's immediate supervisor, and a white woman, was permitted at times to work a three- and four-day week, and (3) by making the broadside charge that CTW had only ten percent minority employees and no other black males working in a research division.

■ Defendant, however, successfully refutes the alleged discriminatory significance of each of these claims. First, Minard denies that he ever authorized plaintiff to work less than the normal 35-hour work week and states that the 32-hour work week requirement concerns only eligibility for full-time benefits. Moreover, even if it were assumed that Minard did give such authorization, plaintiff never claims and defendant and Minard deny that Minard was plaintiff's supervisor; plain-

**5.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine*, — U.S. —, — – —, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *Ste. Marie v. Eastern RR Ass'n*, 650 F.2d 395, at 398–99 (2d Cir. 1981); *Powell v. Syracuse Univ.*, 580 F.2d 1150 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

**6.** *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980); *Aguirre v. Chula Vista Sanitary Serv.*, 542 F.2d 779, 781 (9th Cir. 1976).

**7.** *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct.

576, 58 L.Ed.2d 656 (1978); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977); *Wade v. New York Telephone Co.*, 500 F.Supp. 1170, 1175 (S.D.N.Y.1980).

**8.** *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977); *Wade v. New York Telephone Co.*, 500 F.Supp. 1170, 1175 (S.D.N.Y.1980).

**9.** *See Wooten v. New York Telephone Co.*, 485 F.Supp. 748, 760 (S.D.N.Y.1980).

tiff's supervisors indisputedly denied plaintiff such authorization. Second, Clarke's shortened work week was part of the employment arrangement to secure her services and to effect an orderly transition from her then place of employment, Washington, D.C., by affording her the opportunity to wind up her affairs there before entering into defendant's employ on a regular, full-time basis; it had no relationship to the pursuit of any educational endeavor. Finally, any inference of a pattern of discrimination that might be inferred from CTW having only ten percent minority employees, an inference of dubious probative value since a comparison to individuals possessing the necessary job qualifications is not made,[10] is largely undercut by the fact that plaintiff's replacement after his discharge was also a black male.[11] Accordingly, there are no material factual disputes to overcome defendant's showing that plaintiff's termination was for legitimate business reasons and was not motivated by racial or sexual discrimination. These same business reasons preclude a finding that plaintiff's filing of a charge with the EEOC was a substantial factor in, let alone a "but-for cause" of, his discharge.[12] Summary judgment therefore must be granted as to this issue.

*TRANSFER*

Plaintiff also challenges his transfer from Sesame Street to the science magazine in May 1979. At that time, plaintiff and Jane Shapiro, a white female, were the two Research Assistants for CTW's Sesame Street program. Plaintiff and Shapiro were notified that for financial reasons, one of their positions would be terminated but that this person could continue with CTW by transferring to the science magazine's Research Department at the same salary level. Management, seeking to keep both plaintiff and Shapiro working at CTW, discussed the matter with both of them. Shapiro, who had one week's less seniority than plaintiff, indicated that she was not interested in the transfer because she preferred television to print media and the younger children of the Sesame Street audience to the older readership of the science magazine. She stated that she might leave CTW if transferred. Plaintiff, on the other hand, while expressing a desire to stay at Sesame Street, indicated that he had extensive experience with "print media" and that he was interested in learning more about the new science magazine. On the basis of these factors, CTW management decided that plaintiff should be transferred, which defendant asserts was a legitimate business decision. Plaintiff at that time did not object to the transfer.

Although there is some dispute over the "voluntariness" of plaintiff's transfer,[13] the basic facts recited above are not disputed. Rather, plaintiff now contends that he should have been retained at Sesame Street because he had one-week's seniority over Shapiro and his requirement of time off during regular business hours to attend to his outside classroom commitments was incompatible with the rigid business hours

---

10. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2741, 58 L.Ed.2d 768 (1977); *Ste. Marie v. Eastern RR Ass'n*, 650 F.2d at 401 (2d Cir. 1981).

11. *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282 (7th Cir. 1977); *Wade v. New York Telephone Co.*, 500 F.Supp. 1170, 1174 (S.D.N.Y.1980); *see Wooten v. New York Telephone Co.*, 485 F.Supp. 748, 758–59 (S.D.N.Y.1980).

12. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980); *cf. Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979);

*Mt. Healthy v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

13. Plaintiff claims that in May 1979 he was advised by CTW management that he would be terminated from employment at CTW if he did not accept the transfer. Defendant, on the other hand, notes that, in a claim for relief filed with the EEOC in June 1979, one month after the transfer, plaintiff sought to remain with the science magazine and expressed no desire to return to Sesame Street, and that in the fall of 1979, when plaintiff was offered his original position back at Sesame Street, he declined the offer. Resolution of this dispute is unnecessary for disposing of the underlying issue.

that the science magazine job demanded. Defendant affirms the legitimacy of its business judgment and urges that, in any event, plaintiff is precluded from now contesting his transfer since, four months after the move, he declined an offer to transfer back to the Sesame Street Research Department.

■ For the purposes of this motion, plaintiff will be assumed to possess a cognizable interest under Title VII in avoiding the transfer.[14] Defendant itself admits that plaintiff's transfer delayed any promotion that might have come his way from his work on Sesame Street. Nevertheless, defendant has articulated a sufficient justification for transferring plaintiff. Given the experiences and expressed interests of plaintiff and Shapiro, defendant was entitled as a matter of business judgment to select plaintiff to be transferred despite his slight edge in seniority and his outside classroom requirements. Furthermore, plaintiff's subsequent rejection of the offer to return to Sesame Street effectively waives his right to contest the initial transfer.[15] Summary judgment is granted on this issue.

*PROMOTION*

■ While one of plaintiff's claims, as already noted, is that he should not have been transferred to the science magazine, he alleges that he was discriminatorily denied a promotion within the science magazine from his position as a Research Assistant to the post of Assistant Director of Research. The latter position was instead given to Clarke. Apart from a claim of plaintiff's lack of qualification for the promotion, defendant asserts that plaintiff never applied for the promotion and that a

*prima facie* case of a Title VII violation for failure to promote is not established unless plaintiff shows he sought a promotion.[16] Plaintiff, however, contends that under CTW policy, formal applications for promotions were not required. He alleges that, when he was hired, Lewis Bernstein, then Director of Research, told him that CTW promoted people automatically based on the quality of their job performance and the extent of their outside academic initiatives. Plaintiff thus claims that in light of this conversation and the promotion practice it implies, formal applications for promotions were unnecessary. Plaintiff thus raises material factual issues as to CTW's promotion practices.[17] If his contentions are true, his failure to apply for the Assistant Director position cannot be held against him. Accordingly, summary judgment on the issue of promotion must be denied.

*MERIT SALARY INCREASE*

■ Having joined CTW in July 1978, plaintiff claims that he was discriminatorily denied a merit salary increase due him the following year. Defendant argues that during 1979, pursuant to a Presidential request, CTW followed a 13-month instead of the usual 12-month merit increase schedule, which would have made plaintiff eligible for a merit review in August 1979. However, in August 1979, CTW was revising its compensation program and deferred merit increases for eligible employees on the understanding that these increases when given would apply retroactively to August 1979. The increases were not given until after October 1979, by which time plaintiff was no longer in defendant's employ.

Plaintiff counters this argument by claiming Shapiro was given a performance

---

**14.** *Compare Rodriguez v. Board of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 367 (2d Cir. 1980) *with Caulfield v. Board of Educ. of City of N.Y.*, 632 F.2d 999, 1006–07 (2d Cir. 1980).

**15.** *See Hodge v. McLean Trucking Co.*, 607 F.2d 1118, 1120 (5th Cir. 1979).

**16.** *Mejia v. New York Sheraton Hotel*, 459 F.Supp. 375, 377 (S.D.N.Y.1978); *Logan v. St.*

*Luke's Hosp. Center*, 428 F.Supp. 127, 129 (S.D.N.Y.1977).

**17.** *Cf. Goodman v. Heublein, Inc.*, 645 F.2d 127, 131, slip op. at 2097 (2d Cir. 1981) ("[W]hether a formal application needs to be made for a high-level executive position is a factual question dependent on the particular institutional structure and practices of the employer.")

review after only ten months. Defendant, however, insists that Shapiro did not receive her annual review until December 1979. The dispute over the treatment of Shapiro is material, particularly since she joined CTW only one week after plaintiff and thus is in a position highly comparable to that of plaintiff on this issue. Accordingly, summary judgment here must be denied.

### LATERAL TRANSFER SALARY INCREASE

Plaintiff alleges that CTW had a policy of giving salary increases for lateral transfers, that is, for any employee "transfered to a position in the same grade," and that he was discriminatorily denied such an increase when in May 1979 he was transferred to the science magazine. He also asserts that he did not accept the retransfer back to Sesame Street offered to him because of CTW's failure to abide by this lateral transfer policy, both for the original transfer and for the offer of retransfer. Defendant claims that although CTW had a lateral transfer increase policy beginning in November 1978, this policy was terminated in May 1979, before plaintiff's transfer. Defendant also attempts to negate any inference of discrimination from the timing of this shift in policy by noting that when the initial possibility of a transfer was raised with plaintiff and Shapiro, both were told that no salary increase would accompany it.

Plaintiff does not deny that he and Shapiro were so notified, but points to a submission by defendant to the EEOC in which it implies that plaintiff would receive a lateral transfer salary increase once his probationary period with the science magazine was successfully completed. Plaintiff infers from this submission that the lateral transfer increase policy was still in effect in May 1979 when he was transferred. He also argues that this policy was tied to a "job posting policy" that was still in effect at that time. A factual issue thus is raised as to the time, if any, when the transfer policy was rescinded and, accordingly, sum-

mary judgment on this issue must be denied.

### SCHEDULE

Plaintiff alleges racial discrimination in that his unilaterally proposed 32-hour work week, with absences during business hours three days a week, was denied whereas Bernstein, a white male, had been permitted to take time off to attend classes toward his Ph.D. Plaintiff's allegations as to the precise schedule Bernstein was permitted to adopt are vague, however, based only on a conversation with him when plaintiff joined CTW. Defendant successfully distinguishes Bernstein's case by pointing out that when Bernstein was pursuing his Ph.D. he was never absent during working hours more than three hours per week, as opposed to plaintiff's contemplated schedule which included absences during business hours totalling 11½ hours per week. Moreover, since defendant offered to permit plaintiff to return to Sesame Street and adhere to his proposed schedule, plaintiff cannot now complain that a more restrictive schedule was imposed. Although plaintiff allegedly declined to transfer back to Sesame Street because of the dispute over a lateral transfer salary increase, this dispute does not justify his rejection of defendant's schedule proposal. If plaintiff felt that the denial of his lateral increase was discriminatory, the appropriate remedy was to file an action challenging that denial. As noted, plaintiff's refusal to transfer must be viewed as a voluntary waiver of any rights he might thereby have secured, and thus precludes the Court from granting relief on this issue.[18] Accordingly, summary judgment is granted.

### RESOURCES

Plaintiff claims further racial discrimination in that Bernstein allegedly was permitted to use CTW resources in completing his doctoral work whereas plaintiff was denied this privilege after his transfer. While there is no claim that CTW was contractually obligated to permit use of its

---

**18.** *Hodge v. McLean Trucking Co.,* 607 F.2d 1118, 1120 (5th Cir. 1979).

resources, where an employer's policy and practice affords such an opportunity, it cannot be withdrawn in a discriminatory manner.[19] Although defendant attempts to reduce plaintiff's allegation to a denial of access only to Sesame Street resources, as opposed to all CTW resources, which it then justifies as a legitimate result of plaintiff's transfer away from Sesame Street, plaintiff, at least at one point in his memorandum, claims he was denied access to all CTW resources.[20] Plaintiff has not claimed and the Court does not decide that CTW had a policy of granting its employees access to its resources. Nevertheless, since the broad restriction allegedly applied to plaintiff may be discriminatory when compared with the treatment alleged to have been accorded Bernstein, if in fact a policy of access by employees to CTW resources is established, summary judgment on this issue must be denied.

## VACATION

Plaintiff alleges that he was discriminatorily reprimanded for taking extra vacation days without permission during May 1979 whereas Candace Early, a white female and Assistant Editor to the science magazine, was not challenged for taking a one-week vacation at this time. Defendant denies that the two situations are comparable because Early's responsibilities were editorial and thus, at the time, were not subject to as imminent a deadline as plaintiff's newly assumed research responsibilities. Plaintiff does not rebut this asserted distinction, and, accordingly, summary judgment here must be granted.

## PROBATION

Plaintiff alleges discrimination in that he was placed on a ninety-day probationary period and subjected to performance evaluations during this time after his transfer to the science magazine, even though he had experience in that field and had already served a probationary period at Sesame Street, whereas Clarke, even when she was hired, allegedly was not required to undergo this probationary period or these evaluations. Defendant asserts that probationary periods were imposed after job transfers as a matter of routine CTW policy and that Clarke did undergo such a period when she was hired.[21] Plaintiff denies the existence of the policy and claims that he alone among CTW employees was subjected to its supposed terms. The factual issues thus are in dispute and summary judgment on this issue must be denied.

## EVALUATION

Plaintiff alleges that Clarke discriminated against him by giving him a poor evaluation whereas Clarke and Shapiro received favorable evaluations. As defendant points out, however, Clarke and Shapiro are not similarly situated for this purpose because Clarke did not evaluate her own or Shapiro's performance. Moreover, defendant notes that Clarke's evaluation of plaintiff's black male successor was favorable. No claim thus is stated and summary judgment on this issue must be granted.

## IN–HOUSE PUBLICATION CREDIT

Plaintiff claims that defendant discriminated against him by not giving him in-house publication credit for a project on which he worked, whereas unspecified white employees in research divisions were given such credit. Defendant, on the other hand, contends that such credit was given only in instances of finalized projects and in this case the project was never finalized, so no one, including the white employees on the project, received credit for his contribution. Plaintiff's conclusory allegation that white employees were given such credit is insufficient to rebut defendant's factually specific claim, so summary judgment on this issue must be granted.

---

19. *Chapliwy v. Uniroyal, Inc.*, 458 F.Supp. 252, 275 (D.Ind.1977).

20. Plaintiff's Memorandum of Law in Opposition at 22.

21. Although defendant contends that Clarke, a new employee, was for these purposes not similarly situated to plaintiff, a transferee, the distinction militates if anything in plaintiff's favor. If defendant did not place new employees on a probationary period, there would be even less justification for placing an experienced transferee on probation.

*CONFISCATION OF PROPERTY*

 Plaintiff alleges that defendant temporarily kept from him a calendar and a rolodex that were relevant for his EEOC complaint. The items were later returned to plaintiff. This allegation does not raise a claim of discrimination, and summary judgment must be granted.

*PUBLIC ACCUSATION OF DISHONESTY AND DECEIT*

 Plaintiff alleges discrimination because he was subjected publicly to charges of dishonesty and deceit whereas no white employee at CTW was so charged. The charges stemmed from two alleged incidents: plaintiff's representation in May 1979 that he was paid for and required to work four days per week when in fact he was paid for and required to work five days per week and plaintiff's claim in the fall of 1979 that his extraordinary work schedule was required so he could pursue courses toward his Ph.D. when in fact the schedule was required so he could teach courses as an adjunct instructor. However, while the making of derogatory comments may give rise to a Title VII claim if the comments are sufficiently excessive or opprobrious,[22] the comments here are not of this nature. Thus, it is unnecessary to decide whether a common law charge of fraudulent conduct made against an employee comes within the scope of discriminatory conduct under Title VII. Summary judgment on this issue thus must be granted.

In sum, defendant's motion for summary judgment is granted on the issues of termination, transfer, schedule, vacation, evaluation, in-house publication credit, confiscation, and public accusation of dishonesty and deceit. Summary judgment is denied on the issues of promotion, merit salary increase, lateral transfer salary increase, resources and probation.

So ordered.

22. *Cf. Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir. 1977); *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *Morales v. Dain, Kalman & Quail, Inc.*, 467 F.Supp. 1031, 1040 (D.Minn.1979).