Joseph J. RICHARDSON, Plaintiff,

v.

SUNMARK INDUSTRIES, A DIVISION OF SUN OIL COMPANY OF PENNSYLVANIA, Defendant.

No. CV 81–2994.

United States District Court, E.D. New York.

April 1, 1983.

Joseph J. Richardson, pro se.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant.

MEMORANDUM & ORDER

PLATT, District Judge.

Plaintiff, Joseph J. Richardson, who is black, brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* He alleges that his

employer, defendant Sunmark Industries (Sunmark),[1] disciplined him discriminatorily because of his race. Sunmark now moves for summary judgment. Upon viewing the facts in the light most favorable to plaintiff, we conclude that he has failed to sustain his burden of making out a *prima facie* case of disparate treatment. Therefore, Sunmark's motion will be granted.

Mr. Richardson was hired by Sunmark in 1972 as a gasoline tank truck driver operating out of its Brooklyn Distribution Terminal. The record does not detail plaintiff's job performance during his first five years with Sunmark. However, from 1977 through 1979, he had the highest annual absentee rate of all employees (approximately 35) at the Brooklyn terminal. In 1979, his performance rating was the lowest of all 26 drivers then based at the Terminal. In addition, he received a two-day suspension in 1978 for excessive absenteeism, counseling on at least four occasions for arriving late for work, and warning memos in 1978 for allegedly falsifying his timesheet and for leaving work early. Then, on December 12, 1979, plaintiff drove his 22-ton gasoline delivery truck into the overhead bar of the Hunter's Point Avenue Bridge in Queens, injuring himself and causing about $1,000 damage to the truck. Plaintiff was asked to appear at the Sunmark Terminal on December 24, 1979 for a post-accident interview. He did not. On February 15, 1980, after conducting its own investigation, Sunmark fired plaintiff effective December 12, 1979. The reasons given were the accident and his poor past record.

Pursuant to its agreement with Sunmark, Mr. Richardson's collective bargaining agent took the matter to arbitration. On May 15, 1981, Arbitrator Samuel R. Pierce, Jr. issued an Opinion and Award which found that (1) the accident had been caused by plaintiff's "gross negligence"; (2) his failure to attend the post-accident inter-

view constituted "insubordination"; and (3) prior to the accident, plaintiff had a "relatively good" driving record but a "very poor" disciplinary record. The arbitrator concluded that under the circumstances, Sunmark should have given plaintiff a "very long suspension"—specifically, an 18-month suspension—but should not have fired him. The termination thus was converted into a suspension; the 18-month period expired on June 8, 1981.[2]

Meanwhile, Mr. Richardson filed complaints with the New York State Division of Human Rights (the Division) and the Federal Equal Employment Opportunity Commission (EEOC). On January 16, 1981, after an investigation failed to corroborate any of plaintiff's allegations, the Division dismissed his complaint. Similarly, on July 28, 1981, the EEOC found that there was no reasonable cause to believe the allegations were true, and issued a right-to-sue letter permitting plaintiff to proceed in this Court. He brought the instant action on September 16, 1981.

In addition to a general claim of disparate treatment because of his race, Mr. Richardson raises the following contentions here: (1) non-minorities with less seniority have been given better assignments and equipment; (2) in November, 1979, then-Terminal Supervisor Charles F. Rogers accused him of stealing gasoline and placed a letter of reprimand, which he has not been allowed to see, in his file; (3) although aware that the plaintiff was ill, Assistant Supervisor Robert L. Wheelin ordered him to attend the December 24, 1979 post-accident interview in the hope that he would not be present and thus give Sunmark an excuse to discharge him.

After a careful review of the record, including Mr. Richardson's responses to ¶¶ 6–10, 12, 13, 15, 17, and 19 of Sunmark's Local Rule 9(g) Statement, we are con-

---

1. Sunmark is a Division of the Sun Oil Company of Pennsylvania, now known as the Sun Refining and Marketing Company.

2. Mr. Richardson was on sick leave from the date of the accident to the date of the scheduled post-accident interview. From the latter

date to the date of his retroactive discharge, he was suspended. His discharge ran from December 12, 1979 to May 15, 1981. At that point, the entire period became an 18-month suspension, ending June 8, 1981.

vinced not only that plaintiff's contentions are groundless, but also that Sunmark had ample reason to take disciplinary action against him.[3] Nonetheless, we will proceed to evaluate each specific contention, and then consider whether the record contains any evidence at all suggesting that Sunmark treated plaintiff in a discriminatory fashion.

Plaintiff first alleges that defendant forced him to use inferior equipment on less desirable route assignments, despite his greater seniority. However, this claim is fatally undermined by the fact that plaintiff put nothing into the record regarding equipment and assignments prior to his suspension or the equipment and assignments of other drivers at the Brooklyn Terminal. Affidavit of Doretta P. Hahn [Hahn Affidavit], Exhibit A (Deposition of Joseph J. Richardson, November 8, 1982 [Richardson Deposition]) at 102–04 and 2–3; Plaintiff's Responses to Defendant's Affidavit in Support of Motion to Dismiss [Plaintiff's Response] at 9–10. Moreover, in a sworn affidavit, Terminal Operations Manager Rogers[4] stated that Sunmark changed plaintiff's delivery routes so that he could stay closer to his home, apparently because a family member was ill. Rogers Affidavit, ¶ 7.[5] Because the instant lawsuit is concerned only with Mr. Richardson's 18-month suspension and events that occurred prior to it, his (questionable) assertion that the defendant assigned him to inferior equipment after his return to duty in June, 1981 is irrelevant. Richardson Deposition at 102. His first contention must fail because it is unsupported by the "concrete particulars" necessary to withstand a motion for summary judgment. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

As this Circuit has made clear, "[i]t is not sufficient merely to assert a conclusion without supplying supporting arguments or facts in opposition to the motion." *Id.*

Plaintiff next contends that in 1979 Supervisor Rogers falsely accused him of stealing gasoline, and placed a letter in his file. Sunmark denies this. Rogers Affidavit, ¶ 18. Moreover, when Sunmark tried to determine the basis of this charge, Mr. Richardson did not remember where or when the purported accusation was made, or any facts about it. Richardson Deposition at 12–13. A "conclusory allegation[ ] or denial[ ]" will not withstand a motion for summary judgment supported by affidavit. *S.E.C. v. Research Automation Corp.*, 585 F.2d at 33. This contention also must fail.

Mr. Richardson's third specific claim centers on the December 24, 1979 interview. Plaintiff alleges that on this date he received a telephone call from Mr. Wheelin ordering him to appear at the Brooklyn Terminal later in the day, and that he told Mr. Wheelin that he could not, because he was under medication. Plaintiff's Response at 4. However, plaintiff fails to mention that four days earlier he had agreed to appear for a post-accident interview on December 24, 1979, and that, when Mr. Wheelin called him at noon on that day to find out whether he still intended to appear, plaintiff responded with abusive language. Rogers Affidavit, ¶ 16; Hahn Affidavit, Exhibit C (Arbitrator Pierce's Opinion and Award) at 2–3. Nowhere does plaintiff deny that he agreed in advance to the interview or that he was insubordinate with Mr. Wheelin. Plaintiff may not avoid summary judgment by relating only those parts of a given incident that are helpful to him.

---

**3.** Although we do not necessarily agree with the arbitrator that an 18-month suspension was all that was warranted under the circumstances, we are not here to review the nature of the sanction initially sought by defendant. Rather, our inquiry for purposes of Title VII focuses on "whether *discrimination* occurred and, if so, whether that discrimination was as a result of the plaintiff's race ... or color." *Sullivan v. Boorstin*, 484 F.Supp. 836, 842–43 (D.D.C. 1980).

**4.** From October, 1977 to December 2, 1979, Mr. Rogers was Terminal Supervisor. After being promoted to Operations Manager, he was succeeded by Robert L. Wheelin.

**5.** Plaintiff denies that defendant accommodated him in any way, and contends that his seniority allowed him "to pick and choose [his] time when to start and to pick vacations, and work routes." Plaintiff's Response at 3. We find this claim incredible.

Rather, he must raise a triable issue with regard to the parts of the incident presented by his adversary. Here, instead of calling forth contrary facts, plaintiff has chosen to remain silent. This is not enough, and his third contention must fail.

Because Mr. Richardson is proceeding *pro se,* we would be remiss in granting defendant's motion without scrutinizing the record for any evidence that plaintiff was treated in a discriminatory fashion. We have done so, and found none. Moreover, the affidavits [6] and exhibits submitted by the parties demonstrate that Sunmark was amply justified in taking disciplinary action. We will discuss this in greater detail after outlining the minimum showing plaintiff must make to avoid summary judgment.

■ A *prima facie* case of discriminatory discharge or disparate treatment is made out where plaintiff presents concrete facts showing that he (1) belongs to a racial minority; (2) "was satisfying the normal requirements of his work"; *and* (3) was replaced by a non-minority worker or, if he was not replaced, that "non-minority workers with comparable records were retained while plaintiff was terminated." *Wade v. New York Telephone Co.,* 500 F.Supp. 1170, 1174 (S.D.N.Y.1980). Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), if plaintiff makes out a *prima facie* case, the burden shifts to defendant to

> produce evidence of a legitimate, non-discriminatory reason for its employment decision. If defendant succeeds in rebutting the plaintiff's *prima facie* case with a non-discriminatory reason, the burden shifts back to plaintiff to show that the reason given is merely a pretext for discrimination.

*Reich v. New York Hospital,* 513 F.Supp. 854, 859 (S.D.N.Y.1981). The Fed.R.Civ.P. 56 summary judgment standard applies to each step in the shifting burden analysis set forth by *McDonnell Douglas. Id.*

■ In the instant matter, Mr. Richardson has satisfied the first of the three criteria necessary to establish a *prima facie* case. However, he has failed to satisfy the other two.

In the first place, although "plaintiff need not show perfect or even average performance but only that his performance was of sufficient quality to merit continued employment," *Ombu v. Children's Television Workshop,* 516 F.Supp. 1055, 1058 (S.D. N.Y.1981) (Weinfeld, J.), Mr. Richardson's performance was far from satisfactory. In fact, the undisputed evidence in the record demonstrates that his performance was not of sufficient quality to raise an inference that his suspension was anything but reasonable. In addition to the facts adduced in our discussion *supra* (particularly those pertaining to the December 24, 1979 interview), that evidence consists of the following:

(1) In 1979, plaintiff had the lowest standard performance rating (87 of a possible 100) of all 26 drivers operating out of the Brooklyn Terminal. Only one other driver had a score under 90. The rating formula is intended to determine the amount of time lost due to delay while servicing each delivery point. Rogers Affidavit, ¶ 9 and Exhibit 4.

(2) In each of the three years preceding his suspension, plaintiff's absentee rate was the highest of any employee at the Brooklyn Terminal. In 1977, he was absent 19 percent of his scheduled work hours. The average for all employees at the Terminal (36) was 3.6 percent. In 1978, he was absent 13 percent of the time. The average for all employees (33) was 4.5 percent. In 1979, he was absent 15 percent of the time. The average for all employees (35) was 4 percent. Moreover, plaintiff's absence rates in 1977 and 1979 were significantly higher than

---

**6.** Plaintiff has not submitted any affidavits. However, because he is proceeding *pro se,* we will treat the factual statements in Plaintiff's Response as though they were properly alleged in affidavit form. *See Ombu v. Children's Television Workshop,* 516 F.Supp. 1055, 1057 (S.D. N.Y.1981).

any other employee's (in 1978, one had a rate of 11 percent and another 12 percent, compared to plaintiff's 13 percent rate). Rogers Affidavit, ¶ 10 and Exhibit 5. In 1978, after being counseled for excessive absenteeism and then missing two more workdays in the succeeding six weeks, plaintiff was suspended for two days. Rogers Affidavit, ¶ 11 and Exhibit 6.

(3) Plaintiff acknowledged that he was reprimanded on four occasions for being late, but cites to portions of two depositions which suggest that defendant either did not regularly discipline drivers for tardiness, or permitted them to maintain flexible starting times as long as they worked the required 10-hour day. Plaintiff's Response at 7–8. The relevant sections of these depositions are not in the record. However, even if we take plaintiff's excerpts to be accurate, at most they raise the possibility that defendant would have acted in a discriminatory manner had it suspended plaintiff solely because of his tardiness. We find that, even without this evidence, plaintiff's on-the-job performance was inadequate.

(4) In 1978, plaintiff received a warning letter after his employer found that he had falsified a company timesheet by indicating that he left work at 4 p.m. when in fact he left at 3:30 p.m. Rogers Affidavit, ¶ 13. Plaintiff denies that he ever falsified company documents, but presents no facts tending to show that the defendant's findings were wrong. Plaintiff's Response at 2–3.

(5) Plaintiff also received a warning letter in 1978 for leaving work early without notifying his supervisor. Rogers Affidavit, ¶ 14 and Exhibit 10. Plaintiff does not deny this.

(6) In December, 1979, plaintiff drove his 22-ton delivery truck into an overhead bar on the approach to the Hunters Point Avenue Bridge. At the time, the approach was clearly posted with signs stating "Passenger Cars Only," "No Commercial Traffic" and "Load Limit 3 Tons." Arbitrator Pierce found the accident to have been caused by plaintiff's "gross negligence." We agree with that finding.

Plaintiff's job performance record during the years preceding his suspension was, as the above circumstances collectively demonstrate, clearly inadequate.[7]

Moreover, plaintiff cannot satisfy the third criterion for setting forth a *prima facie* case. After his discharge (later converted to a suspension), he was not replaced by a non-minority worker, nor was he disciplined any more harshly than similarly situated non-minority employees. According to Sunmark, the Brooklyn Terminal currently has 19 truck drivers, seven of whom are black and two hispanic. Since December, 1979, the company has hired only two new drivers. In fact, both were hired after plaintiff's 18-month suspension had ended. One is black, the other hispanic. Rogers Affidavit, ¶ 5. Plaintiff does not dispute this. In addition, a white driver, James Muir, was fired in March, 1981 for falsely adding an hour to his timecard. Like Mr. Richardson, Mr. Muir had a less than exemplary past record. However, we note that Mr. Muir's 1979 performance rating was 90, and that his absence rates for the years 1977, 1978, and 1979 were 3 percent, 5 percent, and 6 percent, respectively. In April, 1980, two other white employees were fired for soliciting and receiving bribes from service station dealers. Although their misdeeds were more serious than Mr. Richardson's, the disciplinary action eventually tak-

---

**7.** Even if for some reason this evidence does not support a finding that plaintiff's job performance was inadequate, we still would hold on this record that Sunmark possessed a legitimate, non-discriminatory reason for suspending plaintiff, and thus had met its burden at the second stage of the three-step analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This holding, of course, would be predicated on a finding that plaintiff had made out a *prima facie* case. As noted *infra,* we find that he has failed to do so, and for a reason unrelated to job performance.

en against Mr. Richardson—suspension—was less severe.

On the basis of the above, we must conclude that Mr. Richardson has failed to satisfy the third criterion necessary to establishing a *prima facie* case.

In summary, we find no basis for the specific claims raised by the plaintiff, or for his more general claim of disparate treatment due to race. Because plaintiff has raised no triable issue of fact in his unsuccessful attempt to make out a *prima facie* case under Title VII, defendant's motion for summary judgment will be granted.

SO ORDERED.