Henry L. MURRAY, Plaintiff,

v.

**UNITED STATES DEPARTMENT OF JUSTICE, FBI, William F. Sessions, and John Doe, Defendants.**

No. CV–91–0539.

United States District Court,
E.D. New York.

May 11, 1993.

Robert J. DeGroot, Newark, NJ, for plaintiff.

Ann M. Gulyassy, Anjali D. Ashley, U.S. Dept. of Justice, Civ. Div., Washington, DC, Arthur P. Hui, Asst. U.S. Atty., Brooklyn, NY, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff Henry L. Murray, a former Special Agent of the Federal Bureau of Investigation ("FBI" or "Bureau"), alleges that the FBI terminated his employment on the basis of race in violation of 42 U.S.C. § 1983 and "other sections of the United States Code and Constitution." Plaintiff also seeks judicial review, pursuant to 5 U.S.C. § 7703, of the decision by the Merit Systems Protection Board ("MSPB" or "Board") affirming his dismissal.[1] Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, or alternatively, for summary judgment pursuant to Rule 56. For the reasons provided below, defendants' motion for summary judgment is hereby granted and this action is dismissed in its entirety.

## FACTS

Plaintiff Henry L. Murray, a black male, was employed for twelve years by the FBI as a Special Agent assigned to the New York Field Office.[2] On August 3, 1990, following an extensive administrative investigation, the FBI removed Murray from its rolls on the grounds that his conduct was "totally unacceptable and incompatible with the standards expected of all employees." (A.R. 63) This determination arose out of an off-duty incident in which Murray vandalized an automobile parked in his leased spot and verbally abused a crowd of onlookers; although Mur-

1. The government filed with this court a certified copy of the MSPB Administrative Record and a certified copy of the transcript of plaintiff's hearing before the Board. Hereinafter, all cites to the Administrative Record are denoted "A.R." and refer to the Bates pagination, and all cites to the transcript are denoted "Tr."

2. Throughout plaintiff's brief there are references to plaintiff's twenty-one years of employment. While this court acknowledges a similar reference in the MSPB opinion (A.R. 1902), the administrative record indicates that plaintiff was an FBI Special Agent for twelve years. (A.R. 13, 82) He commenced employment with the Bureau in April of 1978. (A.R. 296, 987, 995; Tr. 108)

ray initially denied under oath that he had engaged in this conduct, he confessed to the incident the following day. Plaintiff appealed his dismissal to the MSPB, and on December 14, 1990 the Board affirmed the FBI's decision to terminate plaintiff's employment. During the administrative investigation and course of the MSPB proceeding, plaintiff conceded the facts recounted below. He contends, however, that the sanction imposed upon him was disproportionate and discriminatory.

## I. *The Administrative Investigation*

The FBI investigation of Special Agent Murray, which culminated in his August 1990 discharge, commenced as a result of an anonymous letter forwarded to FBI Headquarters on October 23, 1989 by the Assistant Director in Charge ("ADIC") of the FBI's New York Office. This letter—addressed to Director Sessions, the ADIC–New York, two United States Senators, and a United States Congressman—complained of an incident in which Murray had smashed the windows of a vehicle parked in his leased parking space and, when confronted, threatened several observers with physical violence. (A.R. 254–55)[3] The author identified herself as someone who had a parking space near to Murray's.

The FBI, pursuant to its normal practice and procedure, began an administrative investigation of these charges upon receipt of this letter. (A.R. 226–28, 259) FBI Special Agents conducted interviews of the witnesses to the October 9, 1989 events. (A.R. 237–41) They also interviewed Murray several times and eventually had him sign two sworn statements which are discussed in detail below. (A.R. 248, 252)

The administrative investigation revealed that plaintiff indeed had been involved in an incident concerning his parking space. On October 9, 1989 Murray returned from work

to his apartment complex in Forest Hills, New York, used his car to run a brief errand, and again returned to his building, this time to find an automobile improperly parked in his leased space. When faced with this same problem on prior occasions, plaintiff experienced difficulty in getting the violating vehicles removed and had his car stolen and ticketed as a result of having to park on the street. (A.R. 233; Tr. 111–12) On this particular occasion, plaintiff reacted to his frustration by taking a hammer and smashing the car's windshield and side window. (Sworn Statement of Henry L. Murray, dated November 9, 1989, at A.R. 220, 221) When the hammer slipped from his hand into the car, Murray used his feet to kick in the second side window. (A.R. 221) He then approached the building's doorman and told him to find the car's owner or Murray would "tear the f***ing thing up." (A.R. 221)

When Murray returned to the vandalized vehicle, which was then surrounded by a crowd of people, he began shouting abusive remarks and threats. Two of the observers, who later turned out to be the car owner's son and grandson, approached plaintiff and one of the men screamed at him; plaintiff responded by urging that man to back off or Murray would "bash [his] f***ing head in." (A.R. 221) The misparked vehicle was subsequently moved, and plaintiff parked his car in his space. (A.R. 222)

Murray returned to his apartment where he was contacted over his intercom by a New York City police officer who requested that Murray descend to the lobby. (A.R. 222) Not knowing the officer, plaintiff refused; however, he invited the officer up to his apartment. Thereafter, two police officers arrived at Murray's door, and the three men engaged in a short conversation during which Murray denied breaking the car windows. Because he was armed, Murray identified

---

**3.** The letter stated:

[A]s an FBI employee I presume that Mr. Murray may be armed. I shudder to think what such a violent and unstable person might have done.... Perhaps a man might brush this aside, but I found it terribly frightening.... I have no interest in causing Mr. Murray harm, I don't even know him, however, as a citizen, I am deeply concerned over the potential national security risk of such a man having access to sensitive and confidential government files. Certainly, given his display of violent rage, the FBI has no business allowing him to enforce the law which he considers himself above, and by no means should he be permitted to carry a gun.

(A.R. 254–55)

himself as a Special Agent of the FBI and showed the officers his badge and credentials; he refused, however, to give those credentials to the officers or to identify the FBI office in which he worked. The FBI's Manual of Administrative Operations and Procedures (the "Manual"), Part I, § 1–15.2, requires all FBI employees "to report promptly to their supervisors any incidents in which they are involved with law enforcement officials." (A.R. 71) Murray did not report the incident or his contact with the police to his supervisors or co-workers. (Sworn Statement of Henry L. Murray dated November 7, 1990 at A.R. 233, 235; Stipulation ¶ 4 at A.R. 1566) He attributes his failure to do so to his not having known of the reporting requirement and to his observation that the officers seemed satisfied with his responses. (A.R. 235)

The owner of the vandalized automobile, Barbara S. Brodie, filed a report regarding this incident with the New York City Police Department on October 9, 1989. (Stipulation ¶ 3 at A.R. 1565) The owner's grandson filed a second police report on the same date, alleging that his father had been verbally threatened and harassed by plaintiff. (A.R. 1565) The police department subsequently closed these complaints without further investigation. (A.R. 248) No criminal charges were ever brought against plaintiff based on this incident.

The FBI received the aforementioned anonymous letter in late October of 1989. On November 6, 1989, during an initial interview with agents conducting the administrative investigation referred to above, Murray acknowledged using threatening language when he saw a "mob" surrounding his parking space, but he denied that he had broken any automobile windows. (A.R. 231) The agents who interviewed him noted discrepancies between his account of the incident and the other witnesses' accounts, including that of a building security guard (A.R. 241); these discrepancies led the investigating agents to stress to Murray the importance of being candid. (A.R. 231, 238) The material gathered during this interview, conducted without attorneys present, was then used to prepare a sworn statement. (A.R. 233–36) On November 7, 1989 Murray reviewed the statement and made minor corrections to it but did not change the substance of his remarks; he then signed the statement which included the assertion, under oath, that he was not responsible for breaking the windows of the vehicle. (A.R. 235, 236) [4]

The day after signing this sworn statement, plaintiff notified his supervisor and the investigating agents that he wished to make some changes in the statement. He thereafter executed a second sworn statement in which he admitted that he had smashed the car windows, made false statements to the police, and lied under oath. (A.R. 220; Stipulation ¶¶ 5, 6 at A.R. 1566) More specifically, he explained as follows:

I have asked to change my statement because I'm not just an outright liar. Since giving my statement I have had time to think about the incident. Everything I said in my first statement was correct except the fact that I denied responsibility for breaking the windows. In a way I think I am not totally responsible because the owner of the vehicle knew that they should not have parked in my leased space.

When I was first called into the Office to be interviewed for my statement, I was suddenly faced with the possibility of losing my job or perhaps losing my chance for an OP transfer. After twelve (12) years of service the loss of either of these heavily impacted on me. I now know I was wrong in my actions and have apologized for it.

I would also like to state that an interview I did yesterday (November 8, 1989) impacted upon by my conduct. I interviewed a young subject of an ITSP case. During this interview I knew that this

---

4. The statement included the following:

I do not remember if the windows of the car in my parking space were broken when I arrived. I know that I was not responsible for breaking the windows of the vehicle. I do not recall what windows in the car were broken. I was so angry about someone parking in my space I took no notice of the vehicle. I do not recall telling anyone in the garage that I had broken the windows in the vehicle.

(A.R. 235)

individual was lying to me. At that time the realization that my conduct was not much better than this individual's hit me. It was at that point that I decided I needed to change my original statement.

(A.R. 223) Plaintiff also advised that while he had not paid for any of the damage he had caused, "he was prepared to pay for the damage if required." (A.R. 222; Stipulation ¶ 7 at A.R. 1566)

On March 1, 1990 the FBI advised Murray by letter that it was considering his dismissal from the rolls of the Bureau based on five charges: (1) destruction of private property and unprofessional personal conduct in violation of FBI regulations; (2) lack of candor during an administrative inquiry; (3) failure to report contact with police in violation of FBI regulations; (4) acting in an unprofessional manner to police; and (5) failure to recognize the illegality of his actions and lack of remorse. (A.R. 18–21) Plaintiff, through counsel, responded to this letter by asserting that his conduct "though clearly improper, must be understood in light of a number of mitigating facts." (A.R. 115–30) He suggested that the appropriate punishment in his case "should be censure, probation, or at most a brief period of suspension." (A.R. 116)

After considering the evidence discussed above, James W. Greenleaf, FBI Associate Deputy Director of Administration, decided that the five charges against plaintiff had been substantiated by a preponderance of the evidence and ordered plaintiff's dismissal. By letter dated July 25, 1990, plaintiff was informed of his removal from the rolls of the FBI. (A.R. 16, 73) That letter stated:

There is never any justifiable reason for failing to be candid and forthright during an administrative inquiry. The fact that you came forward on your own accord a few days after the signed, sworn statement was executed and admitted to breaking the windows does not minimize the seriousness of your lack of candor. Your failure to be candid from the onset of the inquiry seriously diminishes your credibility as a Special Agent.

In reviewing your misconduct as it relates to the belief that you were justified in doing what you did, I have determined that prior to your April 27, 1990 letter, you never indicated any contrition for your actions in destroying the windows and have consistently held the belief that you were justified in your behavior toward the victims. The fact that you only indicated a willingness to offer restitution to these victims after being advised of your proposed dismissal from the rolls of the FBI indicates a mind-set that is incongruous with the standards demanded of Special Agents of the FBI.

Restitution in this matter is a moral responsibility that you have shirked for over eight months. I find it distressing that you appear to treat this obligation as a penalty that you must pay in order to retain your job.

(A.R. 16–17) On August 3, 1990 plaintiff was removed from the rolls of FBI Special Agents for "conduct which is totally unacceptable and incompatible with the standards expected of all employees." (A.R. 63)

## II. *The MSPB Proceeding*

On August 15, 1990 Murray appealed his dismissal to the MSPB, alleging that the punishment imposed upon him exceeded that imposed upon white and other non-black employees. (A.R. 11, 13) During the MSPB proceeding, in which plaintiff was represented by counsel, the parties agreed on and even stipulated to many facts, including those underlying the October 9, 1989 incident and during the resulting FBI administrative investigation. (Stipulation at A.R. 1565) The only contested issue, therefore, was whether the punishment imposed on plaintiff was disproportionate or discriminatory.

On December 14, 1990 Administrative Law Judge Otis L. Packwood issued an initial decision of the Board, affirming the FBI's dismissal of plaintiff. Pursuant to the applicable regulations, this initial decision automatically became the final decision of the Board on January 18, 1991. *See* 5 C.F.R. §§ 1201.113(a). The MSPB found that based upon the admissions, stipulations, and testimony of the plaintiff, three of the five charges against him were proved by a preponderance of the evidence: (1) destruction

of private property and unprofessional personal conduct; (2) lack of candor during the administrative inquiry; and (3) failure to report contact with police. (A.R. 1896, 1898) The Board found that the fourth charge, acting in an unprofessional manner toward police officers, was not proved. (A.R. 1898) As to the fifth charge, plaintiff's failure to recognize the illegality of his actions and lack of remorse, the MSPB held that this behavior was not an appropriate basis for the adverse action itself but rather was properly considered in assessing an appropriate penalty. (A.R. 1899) The MSPB concluded that the FBI's decision to remove Murray from his position as Special Agent did not exceed the parameters of reasonableness and that plaintiff had failed to demonstrate that this penalty was disparate or predicated on racial discrimination. (A.R.1901, 1906) Plaintiff commenced this federal action on February 12, 1991.

## DISCUSSION

### I. *Motions for Judgment on Pleadings and to Amend Complaint*

■ Plaintiff rests his first cause of action on 42 U.S.C. § 1983 and "other sections of the United States Code and Constitution." As defendants correctly point out, plaintiff's reliance on 42 U.S.C. § 1983 is misplaced, for that statute "applies only to actions taken under the color of *state* law that violate constitutional or federal statutory rights," *Yalkut v. Gemignani,* 873 F.2d 31, 35 (2d Cir. 1989) (emphasis added), and on its face does not apply to actions of the federal government or its officers. *District of Columbia v. Carter,* 409 U.S. 418, 424–25, 93 S.Ct. 602, 606, 34 L.Ed.2d 613 (1973). Furthermore, plaintiff's general reference to the United States Code and Constitution is insufficient to state a cause of action under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), since Title VII provides the "exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. General Services Administration,* 425 U.S. 820, 828–29, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976). Accordingly, even construing all of plaintiff's allegations in their most favorable light, *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), plaintiff fails to state a cause of action under Section 1983.

Plaintiff responds to the above observations by claiming that his citation to Section 1983 and his corresponding failure to cite Title VII was inadvertent—a mere and "unfortunate" "typographical error." For support, he points to the jurisdictional paragraph of his complaint which states:

Jurisdiction of this Court is invoked pursuant to 5 U.S.C. § 7702, 7703; *42 U.S.C. § 2002, 000E–16(c)* and 42 U.S.C. § 1983; 28 U.S.C. § 1983; 28 U.S.C. § 1331 and other provisions of the United States Code and Constitution.

(Complaint ¶ 12) (emphasis added). He urges this court to construe his complaint as asserting a Title VII cause of action by arguing: first, that the statutory sections to which the above paragraph refers are either nonexistent or wholly irrelevant to the factual allegations of the complaint; and second, despite the typographical error, defendants nevertheless had proper notice of plaintiff's factual allegations. Alternatively, plaintiff cross-moves to amend his complaint to reflect his true intent to state a Title VII cause of action.

■ As an initial matter, it is worth observing that plaintiff is not proceeding pro se, and, even more notably, that the "unfortunate" error is not an isolated one. Yet, while Murray's complaint was drafted in a careless manner, this court finds that the allegations contained therein coupled with the jurisdictional paragraph demonstrate that he intended to assert a claim of federal employment discrimination based on race under Title VII, 42 U.S.C. § 2000e–16(c). As defendants concede, they have suffered no prejudice from the typographical error. The denial or grant of a motion to amend is within the discretion of the district court, *Evans v. Syracuse City School Dist.,* 704 F.2d 44, 46 (2d Cir.1983) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)), and leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Although this court refuses to "construe" plaintiff's com-

plaint as not having contained the typographical error, it finds plaintiff's motion to amend appropriately granted. Furthermore, the motion is granted without prejudice since plaintiff pursued his rights in a timely manner and therefore should not be penalized for an inadvertent error in pleading that has not prejudiced defendants.

In sum, defendants' Rule 12(c) motion is denied insofar as it seeks to dismiss the employment discrimination claims altogether. Instead, this court dismisses with prejudice plaintiff's claims under 42 U.S.C. § 1983 and "other sections of the United States Code and Constitution" and grants plaintiff's motion to amend to state a cause of action for federal employment discrimination. The remainder of this opinion discusses defendants' motion for summary judgment on the discrimination claims and the MSPB appeal.

## II.  *Motion for Summary Judgment*

### A.  Discrimination in Federal Employment: "Mixed Cases"

Pursuant to the provisions of the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7701 *et seq.* (the "CSRA"), qualified federal employees may appeal certain adverse employment decisions to the Merit Systems Protection Board. If a case is a "mixed case," in other words involves an appeal from an ordinary personnel action coupled with an allegation that the action was discriminatory, the CSRA sets forth special procedures for review by a federal court. 5 U.S.C. § 7702.[5] The MSPB is required to decide both the issue of discrimination and the merits of the action on appeal within 120 days of the date the appeal is filed. 5 U.S.C. § 7702(a)(1). The Board must sustain an Agency's decision in a "mixed case" if that decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(2); 5 C.F.R. § 1201.56.[6]

A petition for judicial review of an adverse MSPB decision in a "mixed case" must be filed within 30 days of receiving notice of the Board's decision unless the individual asks the Equal Employment Opportunity Commission to review the discrimination issue. 5 U.S.C. §§ 7703(b)(2), 7702(a)(3). While petitions for judicial review of MSPB actions are ordinarily filed in the Court of Appeals for the Federal Circuit and reviewed on the administrative record, 5 U.S.C. § 7703(b)(1), 7701(c)(1)–(3), in a "mixed case" judicial review of the final Board order lies in the district court. 5 U.S.C. § 7703(b)(2). The court must review the discrimination claim de novo, 5 U.S.C. § 7703(c), and the non-discrimination claim on the administrative record. *Barnes v. Small,* 840 F.2d 972, 979 (D.C.Cir.1988); *Romain v. Shear,* 799 F.2d 1416, 1421 (9th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 840 (1987); *Fineman v. United States Postal Service,* 555 F.Supp. 1336, 1341 (S.D.N.Y. 1983). Bearing these principles in mind, this court turns first to plaintiff's discrimination claims and then to his appeal of the MSPB determination.

### B.  Employment Discrimination and Title VII

The well-known pattern of proof for employment discrimination claims brought under Title VII was established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The plaintiff-employee first must establish a prima facie case of discrimination. If the plaintiff carries this initial burden, the defendant-employer then must articulate a legitimate nondiscriminatory reason for the employment action. The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination. It is worthwhile to note that

---

**5.**  The type of discriminatory allegations involved in such mixed cases include allegations of discrimination on the basis of race, color, sex, or national origin as prohibited by section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. 5 U.S.C. § 7702(a)(1)(B); 5 C.F.R. § 1201.-151 (1990).

**6.**  In certain circumstances not applicable here, the Board must find the decision supported by substantial evidence.

"[t]o a large extent ... the strength or weakness of the inference of discrimination created by the employee's *prima facie* case defines the nature of the employee's rebuttal." *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. In determining whether to grant a motion for summary judgment, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, if the nonmoving party would bear the burden of proof on a claim at trial, the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such a claim. *Id.* at 325, 106 S.Ct. at 2554.

To defeat a motion for summary judgment, the nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Furthermore, a court is to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Meiri*, 759 F.2d at 997. Although discrimination claims often require determination of a party's intent—normally not a subject for summary judgment—the Second Circuit has recognized that "the salutary purposes of summary judgment ... apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri*, 759 F.2d at 998; *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989). Bearing these principles in mind, this court now examines Murray's discrimination claims.

### 1. *Prima Facie Case*

To state a prima facie case of discrimination, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position from which was discharged; (3) was discharged; and (4) the discharge occurred in circumstances giving rise to an inference of discrimination. *Lopez v. Metropolitan Life Insurance Co.*, 930 F.2d 157, 161 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991); *Rosen*, 928 F.2d at 532; *Meiri*, 759 F.2d at 995. Although plaintiff's burden of proof at this initial stage of a discrimination case is far from onerous, *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) ("The nature of a plaintiff's burden of proof at the prima facie stage is *de minimus*."), he nevertheless must provide some evidence—direct or circumstantial—to survive a motion for summary judgment.

Murray clearly satisfies the first and third requirements of proof, for he is an African American who was discharged from his place of employment. With respect to whether plaintiff was "qualified" for his position as a Special Agent of the FBI, defendants argue that the undisputed facts of this case demonstrate that Murray was not satisfying his "normal work requirements." *See Richardson v. Sunmark Industries, Div. of Sun Oil Co.*, 560 F.Supp. 733, 736 (E.D.N.Y.1983). More specifically, defendants cite Murray's eruptive and violent behavior on October 9, 1990, his failure to report both the vandalism and his subsequent police contact to his supervisors, and his denial under oath of any misbehavior as inconsistent with the satisfactory performance of the duties required of his position. *See Lopez*, 930 F.2d at 161. This court agrees that commencing on October 9, 1990 and continuing through November 9, 1990 plaintiff engaged in behavior that was inappropriate given his position as a law enforcement officer; however, it finds that this behavior is more appropriately considered as part of defendants' rebuttal rather than plaintiff's prima facie case. In this regard, reference to the facts and holdings of three cases—*Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656

(1978); *Ombu v. Children's Television Workshop,* 516 F.Supp. 1055, 1058 (S.D.N.Y.1981); and *Richardson,* 560 F.Supp. at 733—is illustrative.

In *Powell v. Syracuse University,* 580 F.2d at 1150, plaintiff, formerly a visiting assistant professor of Architecture at Syracuse University, brought a Title VII action alleging that the University had refused to renew her contract of employment based on her race, color, and sex. Defendant countered by asserting that its employment decision rested on its faculty committee's evaluation of plaintiff's students' work, plaintiff's Master thesis, and plaintiff's educational experience. *Id.* at 1152. The district court found that plaintiff failed to establish a prima facie case of discrimination for two reasons: she failed to demonstrate that she was "qualified"; and she failed to show that other individuals possessing the same qualifications were hired in her stead. *Id.* at 1155. Although the Second Circuit affirmed the dismissal, it disagreed with the lower court's analysis, explaining as follows:

> With respect to the first of the court's findings, we believe that the court's approach unnecessarily collapses the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work. This is not merely of formal consequence, for it has the practical effect of requiring the employee to prove not merely that he possesses the basic skills necessary for the job, but rather that he is the best-qualified candidate for the job, under the criteria suggested by the employer. ... In this respect, we agree with the Seventh Circuit's view that under *McDonnell Douglas* "[t]he plaintiff need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him." ... We agree with the Seventh Circuit that proof of competence sufficient to make out a prima facie case of discrimination was never in-

tended to encompass proof of superiority or flawless performance. If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing.

*Id.* at 1155 (*quoting Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1283 (7th Cir. 1977)). The *Powell* court nevertheless found that defendant had established a legitimate nondiscriminatory reason for terminating plaintiff's employment. *Id.* at 1156–57.

In *Ombu v. Children's Television Workshop,* 516 F.Supp. 1055 (S.D.N.Y.1981), also a Title VII action, a research assistant who had taken on a reduced-hour work week argued that he was discharged on the basis of his race and gender. Initially employed to research material for an established children's television program, plaintiff had worked a flexible schedule which allowed him to pursue his graduate education. *Id.* at 1057. Due to budget cuts, however, plaintiff was transferred to a position as research assistant for a newly created science magazine. *Id.* Contrary to his employer's instructions, plaintiff continued to keep his reduced hours and, when the opportunity arose, refused to transfer back to his old and more flexible position. *Id.* at 1057–58. Defendant dismissed plaintiff, pointing to his insubordination and contending that his schedule detrimentally affected his performance and the development of a new magazine. *Id.* at 1058. Relying on *Powell* the *Ombu* court explained as follows:

> To establish that his discharge was due to racial or sexual discrimination, plaintiff must show, among other things, that he satisfied normal work requirements. Plaintiff has submitted evidence that the quality of the work he performed was generally satisfactory. Although some criticisms of his performance are noted, plaintiff need not show perfect or even average performance but only that his performance was of sufficient quality to merit continued employment.

*Id.* at 1058. After examining defendant's proffered reasons for terminating plaintiff's employment and plaintiff's attempt to show that those reasons were pretextual, the court concluded that "there are no material factual

disputes to overcome defendant's showing that plaintiff's termination was for legitimate business reasons and was not motivated by racial or sexual discrimination." *Id.* at 1058–59.

The case upon which defendants place primary reliance for their argument that plaintiff has failed to establish the third element of his prima facie case—that he was "qualified"—is *Richardson v. Sunmark Industries, Div. of Sun Oil Co.*, 560 F.Supp. 733, 736 (E.D.N.Y.1983). The plaintiff in *Richardson*, a gasoline tank truck ·driver, brought an action under Title VII alleging that his employer had suspended him on the basis of race. Richardson's entire course of employment was characterized by excessive absenteeism; low performance ratings; a poor disciplinary record; gross negligence resulting in an accident; and falsification of time sheets. *Id.* at 734. Based on these facts, the court concluded that plaintiff failed to meet his prima facie burden of proof because he failed to show that he was satisfying his "normal work requirements." *Id.* at 736–37. In so holding the court observed that plaintiff's job performance was "clearly inadequate," *id.* at 737, but reasoned that even if the evidence did not support this finding of inadequacy, the employee's behavior provided the employer with a legitimate nondiscriminatory reason for its employment decision. *Id.* at 737 n. 7.

▇▇▇▇ These three cases certainly support the general proposition for which defendants cite them: namely, that a plaintiff's performance must be of a sufficient quality to merit continued employment. However, the cases also indicate that in order to satisfy the minimal burden of proof for a prima facie case, a plaintiff need show only that he possessed the basic skills necessary to continue his employment; occurrence of any misbehavior, these cases indicate, is more appropriately evaluated in the context of whether defendant's termination of plaintiff's employ-

ment was somehow impermissibly affected by his race.

▇▇▇▇ The undisputed facts of this case establish that prior to the vandalism incident Murray had satisfactorily fulfilled the duties of an FBI Special Agent for twelve years. Although the parties dispute how to interpret Murray's past performance ratings, it is clear that he was not involved in any disciplinary proceedings prior to October 9, 1990. *Richardson* is thus distinguishable, for the plaintiff in that case had engaged in a continued course of conduct during which he did not satisfy even minimally the responsibilities attendant to his job.[7] *See Richardson*, 560 F.Supp. at 736–37 ("Plaintiff's job performance record during the years preceding his suspension was, as the above. circumstances collectively demonstrate, ˆclearly inadequate."). That the FBI in the past has imposed less drastic sanctions on other Special Agents who engaged in violent or dishonest behavior supports the conclusion that Murray has at least shown that he was "qualified" despite his misbehavior. As the remainder of this opinion demonstrates, however, this court finds that Murray's behavior in the fall of 1990 was a valid and nonpretextual reason for the FBI's decision to terminate his employment.[8]

### 2. *Legitimate, Nonpretextual Reasons for Dismissal*

Defendants present the following reasons for removing Murray from the rolls of the FBI: during his tenure as a Special Agent, Murray willfully destroyed private property; misled the police about his involvement in this incident; failed to report his contact with police officers to his superiors; and signed a false statement under oath in the course of a subsequent administrative investigation. This conduct clearly violates the standards established by the FBI for its Special Agents

---

7. This court stresses, however, that it finds no merit to plaintiff's argument that *Richardson* is distinguishable because Murray's misbehavior was somehow less egregious than that of Mr. Richardson.

8. Neither party discusses in any detail whether Murray has satisfied the final requirement for proof of a prima facie case: namely, that his

termination arose in circumstances that give rise to an inference of discrimination. *See* Defendant's Brief at footnote 5. Because the parties choose to address this issue in the context of whether defendants' proffered reason for dismissal was pretextual, this court too proceeds to that portion of defendants' argument.

and is also inconsistent with society's expectations regarding behavior by a law enforcement officer. There is no dispute that dismissal was an available sanction for plaintiff's behavior. (A.R. 1570–73) Acknowledging all of these facts, plaintiff nevertheless contends that race was a factor in the Bureau's decision to opt for the drastic sanction of dismissal as opposed to choosing one of its other disciplinary alternatives: censure, probation, suspension, or some combination of the three.

■■■■ To defeat a motion for summary judgment, the nonmoving party need not actually prove that the employer's proffered reasons for discharging him are pretextual, but only must produce evidence from which a trier of fact reasonably could draw an inference of discrimination. *Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 7 (2d Cir.1989); *Budd v. City University of New York Baruch College*, 749 F.Supp. 86, 91 (S.D.N.Y.1990). A nonmoving party may raise a question of fact concerning discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see also Ramseur*, 865 F.2d at 465 ("[T]he absence of direct or explicit evidence that a challenged personnel action was motivated by race is not fatal to a claim of race discrimination. A showing that a proffered justification is pretextual is itself sufficient to support an inference that the employer intentionally discriminated."); *Dister*, 859 F.2d at 1115 ("[T]he evidence must—at a minimum—create a genuine issue of fact as to [defendant's] offered reasons or as to a discriminatory motive."). Mere conclusory allegations and assertions will not suffice to defeat such a motion, however. *Meiri*, 759 F.2d at 998. Defendants assert that plaintiff's lying under oath coupled with his public but off-duty violent conduct and lack of contrition led to their decision to dismiss him. Plaintiff responds by urging this court to view with skepticism the claim that dishonesty under oath undermines one's ability to be an effective agent and by arguing that the evidence raises a question of

fact concerning whether the penalty imposed upon him was disparate.

■■■■ Turning first to whether plaintiff provides any basis upon which a trier of fact reasonably could find defendants' proffered reasons unworthy of credence, everyone involved in this action agrees that plaintiff's behavior clearly was inconsistent with the standards expected of him as a law enforcement officer. Although Murray suggests that "an alternative position may exist in which [his] experience and skills may be utilized that would avoid, some, if not all, of the problems raised by defendants," he provides no reason to doubt defendants' observation that FBI Special Agents often find themselves in stressful or dangerous situations where they must maintain control and presence of mind. These characteristics, necessary to ensure the safety of the officers and the public, are indisputably inconsistent with plaintiff's violent outburst and destruction of private property. Furthermore, the course of conduct that succeeded the October 9 incident—plaintiff's lying to police officers, not reporting contact with those officers, lying in sworn testimony, and not compensating the owner for damage to her automobile—legitimately increased the FBI's reluctance to have plaintiff continue working as a Special Agent. The fact that plaintiff had held this position for twelve years without incident does not of itself counterbalance the serious implications of his behavior on his future performance.

Defendants also claim that plaintiff's dishonesty so undermined his future credibility that the dishonesty of itself justified his dismissal. Noting that Special Agents often are required to testify in criminal proceedings where credibility is essential, defendants argue that the fact that a Special Agent has previously lied under oath may be used to impeach his credibility. In support of the proposition that defense attorneys often seek the personnel folders of law enforcement witnesses, defendants cite *United States v. Henthorn*, 931 F.2d 29, 31 (9th Cir.1991) (holding that government has duty to examine personnel files of testifying law enforcement officers for "evidence of perjurious conduct or other like dishonesty" when defen-

dant requests such material), *cert. denied,* —— U.S. ——, 112 S.Ct. 1588, 118 L.Ed.2d 306 (1992). Plaintiff labels defendants' "credibility" argument speculative and, for support, cites cases which, in contrast to *Henthorn,* have upheld the government's refusal to turn over an officer's personnel file absent a finding that the contents of that file were material to the outcome of the case. *E.g. United States v. Driscoll,* 970 F.2d 1472, 1482 (6th Cir.1992) (upholding government's refusal to disclose testifying officers' personnel files based only on defendant's speculation that files contained material useful to impeach officers' credibility), *cert. denied,* —— U.S. ——, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993); *United States v. Andrus,* 775 F.2d 825, 842–43 (7th Cir.1985) ("speculative assertion that impeaching material may be in a government file did not warrant an order to disclose the contents of the file or to produce the file for the court's inspection"); *United States v. Pitt,* 717 F.2d 1334, 1338–39 (11th Cir.1983) (affirming district court's holding that because defendant had failed to demonstrate FBI agent's file contained material evidence files were properly not turned over to defense), *cert. denied,* 465 U.S. 1068, 104 S.Ct. 1421, 79 L.Ed.2d 746 (1984).

Two observations surface from the cases cited by the parties. First, the law in the Second Circuit as to the availability of personnel folders for any material they might contain concerning a testifying officer's credibility is not clear. *See United States v. Kiszewski,* 877 F.2d 210, 216 (2d Cir.1989) ("We agree with appellant that it was error for the district court to refuse to compel production of [the testifying FBI Agent's] personnel file for in camera inspection based solely on the representations of the government. The law is clear that *Brady* and its progeny require that the government disclose material impeachment evidence. Impeachment of a witness can make the difference between acquittal and conviction, and this is particularly true in a trial for making false declarations, where credibility is the central issue in the case and the evidence presented at trial consists of opposing stories presented by the defendant and government agents.") (citations omitted); *United States*

*v. Leonard,* 817 F.Supp. 286, 305–06 (E.D.N.Y.1992) (granting in part and denying in part defendant's request that court conduct in camera inspection of testifying FBI agents' personnel files to determine whether files contain material relevant for impeachment). Second and more importantly, even assuming that defense counsel would not have access to the fact that Murray lied under oath, the cases cited by plaintiff provide no reason to question defendants' primary assertion: that Murray's past dishonesty would undermine his credibility with his employer, with Assistant United States Attorneys, with fellow Special Agents, and with any other members of his investigatory teams. In other words, irrespective of whether Murray's dishonesty ultimately would be available as impeachment material under *Brady,* his behavior clearly impinges on his ability to conduct himself in accordance with the FBI's legitimate expectations of its personnel.

In sum, this court finds that plaintiff provides no evidence that would enable a trier of fact reasonably to question defendants' reasons for terminating plaintiff's employment. Accordingly, this court turns to the second method by which Murray attempts to show that there is a genuine question of material fact going to whether the FBI's decision to discharge him was discriminatory. Plaintiff asserts that other Special Agents "who falsified records or lied under oath were not terminated and were also non-minority individuals." (Plaintiff's Brief at 23) However, the evidence submitted by plaintiff does not bear out his assertion and, indeed, provides no basis upon which a reasonable trier of fact could find that defendants' decision to discharge plaintiff was partially based upon impermissible consideration of race.

First, plaintiff provides a summary of analogous case histories of disciplinary proceedings involving Special Agents. (A.R. 1850–55) He correctly points out that in each of these cases lesser sanctions than dismissal were imposed. However, these cases involved both minority and nonminority agents; in fact, three out of the seven agents who were censured or suspended for their behavior—rather than dismissed—were black and

one of the seven was Hispanic. Thus, these cases fail to support plaintiff's charge of that his dismissal was discriminatory.

Second, plaintiff provides a quarterly summary of disciplinary matters that involved lack of candor or other falsifications and spanned the years 1985 to 1990. (A.R. 1843–49) This report indicates nothing about the race of the agents who were subjected to discipline. Furthermore, the report demonstrates that although the FBI more frequently imposed a combination of censure, probation, and suspension as a sanction for falsifications, dismissal was imposed in approximately one third of the cases. The ALJ noted that in the two cases that actually involved false statements under oath, the first agent was dismissed and the second was censured, placed on probation for a year, and suspended from duty without pay for a month. (A.R. 1846) In contrast to the ALJ, however, this court finds that not only are those two cases similar but many of the other cases are similar to this case as well; even so, these analogous cases fail to establish any indication of impropriety or disparity in sanction. In fact, this report supports defendants' assertion that the FBI often views dismissal as an appropriate sanction for violent and dishonest behavior.

Third, plaintiff attaches to his opposition papers an appendix containing, in relevant part, excised portions of two documents: An Equal Employment Opportunity ("EEO") Program Evaluation by the Office of Program Evaluations and Audits ("OPEA"); and a Memorandum from Delbert C. Toohey to the Director of the FBI on the subject of EEO Discipline Matters. Plaintiff fails to cite or refer to any specific portions of these exhibits and, in fact, this court has failed to locate any general reference to the appendix in either of plaintiff's briefs. Nevertheless, a brief examination of those documents reveals that neither supports plaintiff's contention of discriminatory treatment. The first discusses the FBI Special Agent recruiting, hiring, and promotion process. While it reflects that the Bureau employed and promoted more minority than nonminority agents, although this fact might help plaintiff establish a prima facie case, see footnote 9 supra, it

indicates nothing about whether defendants' dismissal of plaintiff was pretextual. The second exhibit contains statistical data which was compiled by a private research firm hired by the Department of Justice concerning Special Agent career enhancement, assignments, transfers and disciplinary matters. The memorandum states in relevant part as follows:

> In a further attempt to determine if one racial group is being punished more severely than another, OPEA reviewed specific violations and disciplinary actions imposed upon each racial group. The methodology employed in this phase included a stratified random sampling of the Special Agent population broken down by race for Special Agents involved in infractions.... The stratified random sampling resulted in the review of 21 files. The first area of review considered the disciplinary actions resulting in dismissal which is the most severe action that can be imposed by the FBI.... This sample review revealed activities in common such as lack of candor and criminal activity on the part of the Special Agent which resulted in dismissal, irrespective of race.

(Plaintiff's Brief, Appendix, Document 2 at 6–7) There is nothing contained within this document that supports plaintiff's assertion that discharge for his behavior was improper.

In employment discrimination cases summary judgment is appropriate when a plaintiff has failed to establish a prima facie case of discrimination or has failed to provide sufficient evidence to allow a rational trier of fact to find that the legitimate nondiscriminatory reasons offered by the employer were pretextual. *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 110 (2d Cir.1992); *Dister*, 859 F.2d at 1113–14; *Meiri*, 759 F.2d at 995–97. Although plaintiff Murray meets the minimal burden of proving a prima facie case, this court finds that he has adduced no proof that would lead a reasonable juror to conclude that his dismissal was illegitimate and pretextual or that the sanction imposed upon him was disproportionate or disparate. The case histories and quarterly reports upon which plaintiff relies do not support his assertion that the

proffered reasons for plaintiff's termination are not worthy of credence. While this court must construe all reasonable ambiguities and inferences in favor of the nonmoving party, *Ramseur*, 865 F.2d at 465, when that party bears the burden of proof on a particular issue—here pretext—the court may grant summary judgment against him. *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) ("Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim."); *see also Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (summary judgment appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").[9]

### C. Appeal of MSPB Decision

■ In his second cause of action plaintiff seeks judicial review of the MSPB decision affirming his dismissal from the FBI. As mentioned above, judicial review of MSPB decisions that do not involving discrimination claims is "narrowly confined" and based exclusively on the administrative record. *Fineman*, 555 F.Supp. at 1341; *see also Penna v. United States Army, Corps of Engineers*, 490 F.Supp. 442, 443 (S.D.N.Y.1980). The MSPB's decision must be affirmed unless the court finds it to be:

(1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule or regulation having been followed; or

(3) unsupported by substantial evidence.

5 U.S.C. § 7703(c); *Barnes*, 840 F.2d at 979; *see also Hayes v. Dep't of Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984) (holding that reviewing court discharges its duty by determining "whether the contested decision complies with the applicable statute and regulations and whether it has a rational basis supported by substantial evidence from the record taken as a whole. The record need only disclose such relevant evidence as might be accepted by a reasonable mind as adequate to support the conclusion reached.").

In this case, plaintiff does not contest any of the procedures employed during the MSPB proceedings, nor did he raise any procedural objections during the hearing. Furthermore, he cannot reasonably question the MSPB's finding that three of the five charges against him were proved, for the evidence supporting those charges derived from plaintiff's own testimony and stipulation.[10] Rather, plaintiff concedes that "his

---

9. Plaintiff alternatively requests a Rule 56(f) adjournment based on an affidavit from Antonio V. Silva which attests to the fact that other "evidence exists with regard to the discriminatory treatment by the FBI of its minority agents in disciplinary matters." (Plaintiff's Reply Brief at 7) Mr. Silva, an attorney with experience in representing Hispanic FBI Special Agents in discrimination actions, explains that his affidavit is necessarily vague due to an order sealing all the discovery records he had obtained in those cases. This court finds no merit to plaintiff's adjournment request. Plaintiff filed this action in February of 1991 after an extended administrative investigation. Defendant moved for summary judgment in September of 1991, seven months later. Plaintiff nevertheless fails to explain why or how he will be able to discover material now that he has been previously unable to discover.

10. The MSPB determined that the evidence supported the following charges: (1) destruction of private property and unprofessional personal conduct; (2) lack of candor during the administrative inquiry; and (3) failure to report contact

with the police. With respect to the first charge, plaintiff admitted to breaking three windows of an automobile parked in his leased space and also admitted to making verbal threats to onlookers. (Stipulation ¶ 2 at A.R. 1565; Tr. at 113–14) These actions violate the FBI's Manual of Administrative Operations and Procedures, Part I, § 1, which requires FBI employees to comport themselves so that their activities on and off duty will not discredit them or the FBI. (A.R. 65) As to the second charge, plaintiff conceded that he signed a false statement under oath during the administrative investigation. (Stipulation ¶¶ 5, 6 at A.R. 1566; Tr. at 122–23) As to the third charge, the FBI manual, Part I, § 1–15.2(2), requires all FBI employees to report promptly to their supervisors any incidents in which they are involved with law enforcement authorities. Plaintiff conceded that he did not report his October 9th contact with local police, (Stipulation ¶ 4 at A.R. 1566; Tr. at 139), although he argued that he did not know to whom to make such a report; the MSPB properly concluded that this justification did not relieve plaintiff of his obligation. (A.R. 1897)

conduct warranted some form of discipline" (Plaintiff's Brief at 27), but contends that the FBI's decision was not in accordance with law for the Bureau failed to demonstrate that his discharge, as opposed to some less severe penalty, would "promote the efficiency of the service." 5 U.S.C. § 7513; *Dominguez v. Dep't of Air Force*, 803 F.2d 680, 682–83 (Fed.Cir.1986); *Mizerak v. Adams*, 682 F.2d 374, 376 (2d Cir.1982).

To establish a nexus between the employee's misconduct and the "efficiency of the service," an agency must show that the misconduct adversely affects the job performance of the employee or his co-workers. As the Second Circuit has noted, "where an employee's misconduct is in conflict with the mission of the agency, dismissal without proof of a direct effect on the individual's job performance is permissible under the 'efficiency of the service standard.' " *Borsari v. Federal Aviation Administration*, 699 F.2d 106, 110 (2d Cir.), *cert. denied*, 464 U.S. 833, 104 S.Ct. 115, 78 L.Ed.2d 115 (1983); *see also Graybill v. United States Postal Service*, 782 F.2d 1567, 1573–74 (Fed.Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986) (holding, in case where postal worker dismissed after pleading guilty to charges of sexual misconduct with a minor, that agency may demonstrate nexus where egregious nature of conduct "speaks for itself"). As described in the earlier sections of his opinion, Murray's violent behavior, albeit off duty, and his subsequent lack of candor under oath, was in fundamental conflict with his role as a law enforcement officer. That position requires conformance to a higher standard of conduct than is expected of non-law enforcement employees. *Yeager v. General Services Administration*, 39 M.S.P.R. 147, 150 (1988); *Quander v. Dep't of Justice*, 22 M.S.P.R. 419, 422–23 (1984), *aff'd*, 770 F.2d 180 (Fed.Cir.1985). Furthermore, as the MSPB observed, plaintiff's violent behavior was witnessed by a large crowd, even precipitating an anonymous letter. Clearly, the MSPB's determination that plaintiff's misconduct had an adverse effect on the public mission of the FBI meets the requirements of the "efficacy of the service" standard.

In considering whether a sanction imposed by an agency is appropriate, the MSPB must:

> make sure that the agency considered all factors relevant to the case, such as the authorized range of penalties, the nature of the offense, its relation to the employee's duties, the effect of the offense on the agency's confidence in the employee, and possibly eight additional factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 [5 M.S.P.R. 280] (1981). When the MSPB is satisfied that all relevant factors have been considered by the agency and there has been a responsible balancing of those factors, as occurred here, that ends the matter. As the board also pointed out in *Douglas, id.* at 328 [5 M.S.P.R. 280], "[management of the federal work force and maintenance of discipline among its members is not the Board's function. Any margin of discretion available to the Board in reviewing penalties must be exercised with appropriate deference to the primary discretion which has been entrusted to agency management, not to the Board." This view is confirmed by recent caselaw.

*Hayes*, 727 F.2d at 1540. A reviewing court must "defer to the judgment of the agency as to the appropriate penalty for employee misconduct, unless its severity appears totally unwarranted." *Krauthamer v. Block*, 587 F.Supp. 254, 257 (S.D.N.Y.1984) (*quoting Brewer v. United States Postal Service*, 647 F.2d 1093, 1098, 227 Ct.Cl. 276 (1981), *cert. denied*, 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982)); *see also McClaskey v. United States Dep't of Energy*, 720 F.2d 583, 586 (9th Cir.1983) (reviewing court should defer to MSPB's judgment unless penalty so harsh as to constitute abuse of discretion); *Gipson v. Veterans Administration*, 682 F.2d 1004, 1011 (D.C.Cir.1982) (refusing to substitute its view of appropriate sanction or displace agency's judgment unless sanction "so clearly excessive as to constitute abuse of discretion"); *Fineman*, 555 F.Supp. at 1344 ("The agency determination [regarding sanction] must be upheld unless it is so harsh as to amount to such an abuse of discretion that

upon all the facts it can be said to be arbitrary and capricious.").

■ In this case, the MSPB determined that the agency had considered the relevant factors that were set forth in *Douglas v. Veterans Administration*, 5 MSPB 313, 5 M.S.P.R. 280 (1981), including: the authorized range of penalties; the nature of plaintiff's offenses; the relation of those offenses to plaintiff's duties; plaintiff's past disciplinary and work records; the consistency of the penalty with those imposed on other employees for similar offenses. Once again, upon review of the MSPB decision, this court agrees that a thoughtful balancing took place and a reasonable result was reached.[11] There is no dispute that dismissal was within the authorized range of penalties for each of the three charges sustained against Murray. (A.R. 1570–73) The Board rejected plaintiff's claim that the penalty imposed was disparate because it found that the cases cited by plaintiff "were not similar in vital respects to the case at bar"; only two of the thirty-two cases cited by plaintiff involved false statements under oath and in one of those cases the employee was removed and in the other the employee was placed on probation for one year and suspended without pay for 30 days. (A.R. 1905) After balancing the *Douglas* factors, the Board concluded that "the penalty that was imposed does not exceed the parameters of reasonableness." (A.R. 1906)

Since the Board considered and weighed all the relevant factors in making its determination that Murray's discharge was an appropriate sanction, its decision must be upheld. *See Dominguez*, 803 F.2d at 684 ("[T]he court cannot and will not disturb a penalty unless it is unauthorized or exceeds the bounds of reasonableness because it is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion.... Whether the court would have selected a different penalty had it made the initial determination is irrelevant."); *Hayes*, 727 F.2d at 1540 ("When the MSPB is satisfied that all relevant factors have been

considered by the agency and that there has been a responsible balancing of those factors, as occurred here, that ends the matter."); *Weiss v. United States Postal Service*, 700 F.2d 754, 758 (1st Cir.1983) ("penalty determinations are judgment calls that should be left to the discretion of the employing agency."). As the Supreme Court has instructed, "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop v. Wood*, 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976). For all these reasons, this court refuses to disturb what was a reasonable decision by the Bureau and the MSPB. Accordingly, plaintiff's appeal of the MSPB determination affirming his discharge is dismissed.

### CONCLUSION

For the reasons stated above, this court hereby grants summary judgment to defendants and, therefore, dismisses this action in its entirety.

SO ORDERED.

---

11. It is worth observing that the MSPB's decision differed from the Agency's decision on the fourth and fifth charges against Murray, indicating that the Board did not merely affirm the

FBI's determination without drawing independent conclusions based on the submitted evidence.